**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>TS EMPLOYMENT, INC.,<br><br>           Debtor. | Case No. 15-10243 (MG)<br><br>Chapter 11 |
| In re<br><br>CORPORATE RESOURCE SERVICES, INC., *et al.*,[1]<br><br>           Debtors. | Case No. 15-12329 (MG)<br><br>Chapter 11<br>(Jointly Administered) |
| JAMES S. FELTMAN, not individually but solely as chapter 11 trustee for TS Employment, Inc., Corporate Resource Services, Inc., *et al.*,<br><br>           Plaintiff,<br><br>           v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO FINANCIAL LEASING, INC.,<br><br>           Defendants. | Adv. Pro. No. ___ |

## ADVERSARY COMPLAINT

Plaintiff James S. Feltman, not individually but solely as chapter 11 trustee ("Trustee" or "Plaintiff") for the bankruptcy estates of TS Employment, Inc. ("TSE"), Corporate Resource Services, Inc. ("CRS"), and CRS's subsidiaries Accountabilities, Inc., Corporate Resource Development Inc., Diamond Staffing Services, Inc., Insurance Overload Services, Inc.,

---

[1] The Debtors in these jointly administered chapter 11 cases are: (1) Corporate Resource Services, Inc., (2) Accountabilities, Inc., (3) Insurance Overload Services, Inc., (4) Integrated Consulting Services, Inc., (5) Corporate Resource Development Inc., (6) The CRS Group, Inc., (7) Diamond Staffing Services, Inc., and (8) TS Staffing Services, Inc.

Integrated Consulting Services, Inc., The CRS Group, Inc. and TS Staffing Services, Inc. (the "CRS Subsidiaries," together with CRS, the "CRS Debtors," and collectively with TSE, the "Debtors"), hereby states for his Complaint as follows:

## NATURE OF THE ACTION

1.      For at least two years preceding the Debtors' bankruptcies, Wells Fargo Bank, N.A. ("Wells Fargo") was dissatisfied with its relationship with the CRS Debtors. Wells Fargo pushed the CRS Debtors to leave Wells Fargo and obtain financing from other sources by decreasing loan advance rates (resulting in lower availability), blocking CRS from repaying intercompany indebtedness to TSE, and imposing fees and conditions upon the CRS Debtors' borrowing. As part of that strategy, starting in June 2014, Wells Fargo charged more than $4.0 million in "monitoring" and "facility" fees to the CRS Debtors, over and above interest, expenses and other charges under the loan agreements. Those fees were not designed or intended to compensate Wells Fargo for risk, but rather to compel the CRS Debtors to exit the Wells Fargo relationship, and included a $500,000 fee foisted upon the CRS Debtors as Wells Fargo forced them into liquidation.

2.      Following TSE's bankruptcy, Wells Fargo imposed additional conditions and charges that cost the Debtors and their creditors more than $4.0 million more, including the installation of two different chief restructuring officers (at a cost exceeding $2.8 million) and an additional entity to monitor the collection of accounts receivable (at a cost exceeding $1.1 million).

3.      Taking advantage of its position, post-petition Wells Fargo obtained payment from the CRS Debtors of a $2.54 million overdraft in an affiliate account that the CRS Debtors had no obligation to pay. Wells Fargo then opened a post-petition account in TSE's name without the knowledge or permission of either TSE's Chief Restructuring Officer or the Trustee,

and used that account to assess hundreds of thousands of dollars of "Client Analysis Service Charges" that turned out to be obligations owed by other companies owned by Robert Cassera— which again the Debtors had no obligation (and TSE had no Court permission) to pay. Wells Fargo purposefully obfuscated and concealed the nature of those charges from TSE's Chief Restructuring Officer and the Trustee, and then had the audacity to charge the Debtors' estates for legal fees incurred in connection with its scheme.

4. The Trustee brings this complaint against Wells Fargo and Wells Fargo Financial Leasing, Inc. to recover more than $7 million in transfers of the Debtors' property that may be avoided and recovered under the Bankruptcy Code and applicable state law. The Trustee also seeks reimbursement of attorney's fees and estate expenses, and punitive damages, on account of Wells Fargo's egregious post-petition conduct.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this is an adversary proceeding arising in and related to the chapter 11 cases *In re TS Employment, Inc.*, Case No. 15-10243, and *In re Corporate Resource Services, Inc. et al*, Case No. 15-12329, pending in the United States Bankruptcy Court for the Southern District of New York.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

7. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8. The Trustee consents to entry of final order or judgment by this Court.

## THE PARTIES

9. Plaintiff James S. Feltman is the chapter 11 trustee for each of TSE and the CRS Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for this region on February 27, 2015 and September 22, 2015, respectively.

10. Debtor TSE is a privately-held Florida corporation, with its principal place of business in New York. At all times relevant to this Complaint, Robert Cassera ("Cassera") directly or indirectly owned of 100% of the issued and outstanding stock of TSE and held himself out as TSE's president.

11. Debtor CRS is a formerly publicly-traded Delaware corporation, with its principal place of business in New York. Cassera directly or indirectly owned of the majority of the issued and outstanding stock of CRS.

12. Debtor Accountabilities, Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

13. Debtor Insurance Overload Services, Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

14. Debtor Integrated Consulting Services, Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

15. Debtor Corporate Resource Development Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

16. Debtor The CRS Group, Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

17. Debtor Diamond Staffing Services, Inc. is a Delaware corporation with its principal place of business in New York. CRS owns all of its stock.

18. Debtor TS Staffing Services, Inc. is a Texas corporation with its principal place of business in New York. CRS owns all of its stock.

19. Defendant Wells Fargo Bank, N.A., is a nationally chartered bank headquartered in San Francisco, California.

20.     Defendant Wells Fargo Financial Leasing, Inc. ("WFFL") is an Iowa corporation headquartered in Des Moines, Iowa.

## FACTS

### The Tri-State Staffing Business

21.     Tri-State Employment Service, Inc. ("Tri-State," and collectively with its wholly-owned subsidiaries "Tri-State Group") is a New York corporation with its principal place of business in New York.  Cassera directly or indirectly owns 100% of Tri-State's issued and outstanding stock and at all times relevant to this Complaint was the president and a director of Tri-State.

22.     Cassera founded Tri-State in 1993 as a temporary staffing company.  The company grew in size over the next 15 years, including through acquisitions that became part of the Tri-State Group.  Over time, corporations within the Tri-State Group began to serve as the professional employer organizations ("PEO") for staffing businesses within the Tri-State Group, and for other staffing businesses owned by Cassera.

23.     By 2009, the Tri-State Group had become a national provider of staffing, recruiting and consulting services, with a focus on light industrial, clerical and administrative support and insurance related staffing.

24.     Tri-State Group had a long-standing receivables financing relationship with Wells Fargo and/or its affiliates.  In connection with that financing relationship, Tri-State Group entities pledged or assigned their customer receivables to Wells Fargo, and Wells Fargo extended credit to Tri-State Group entities.  That financing relationship also included a letter of credit facility used by the Tri-State Group in connection with its workers compensation insurance program.  As of 2009, Wells Fargo was extending roughly $70 million in credit to Tri-State Group entities, including the letter of credit facility.

25.     By 2009, Wells Fargo had become concerned about its lending relationship with Tri-State and in particular the lack of visibility into Tri-State's finances.  One area of particular concern to Wells Fargo was the Tri-State Group's federal payroll tax obligations, with respect to which Wells Fargo had begun receiving copies of non-payment and tax lien notices.

### The CRS and TSE Businesses

26.     In 2009, Cassera decided to transition a number of the Tri-State Group's staffing businesses to a public company structure.  A public company structure was encouraged by Wells Fargo as a means of providing greater financial transparency to Wells Fargo, and Wells Fargo committed to provide financing to the new public staffing company.

27.     In 2010, Accountabilities, Inc., which at the time was directly or indirectly majority-owned by Cassera, completed a holding company reorganization and became a wholly-owned subsidiary of CRS (incorporated the previous year), CRS became a publicly-traded company, and Cassera became the direct or indirect majority owner of CRS.  Thereafter, CRS began pursuing a strategy of rapid expansion by acquiring staffing businesses from Tri-State, Cassera and competitors.

28.     TSE was incorporated by Cassera to act as PEO for the CRS Debtors' staffing businesses, including for Tri-State and Cassera-owned staffing businesses as they were acquired by CRS.  The CRS Debtors were TSE's only customers.

29.     Pursuant to an agreement dated August 27, 2010 (the "TSE PEO Agreement"), TSE agreed to provide PEO services to CRS.  As the PEO, TSE was the co-employer of record for the hundreds of thousands of temporary or seasonal workers sourced by the CRS Debtors for their customers and was responsible for the payment of temporary worker's wages and payroll,

remittance of withholdings, payment of employer taxes, risk management underwriting and payment of workers' compensation insurance and expenses.

30.     By the end of 2013, the CRS Debtors had roughly 800 employees and operated at over 200 locations.  CRS's gross revenue had grown from $120.9 million in fiscal year ending September 30, 2010 to $819.7 million in 2013.  In 2013, the CRS Debtors placed approximately 150,000 temporary workers with approximately 5,000 customers.

31.     CRS's apparent success in large part derived from its ability to provide customers with temporary and seasonal workers at competitive costs and its access to working capital to fund acquisitions and provide customer financing.  The CRS Debtors were thus able to offer an expanding customer base—including a number of Fortune 500 companies—competitive pricing and short-term financing to help them to more evenly distribute the expense of seasonal staffing, an attractive differentiator from many other staffing companies.

32.     Much of CRS's access to liquidity and working capital was attributable to financial accommodations purportedly made by TSE.  In order to provide the liquidity and working capital needed to finance CRS's third-party acquisitions and help cover the substantial overhead costs associated with CRS's public holding company structure, TSE permitted CRS to defer payment of certain obligations to TSE, and provided additional financial accommodations to CRS.

33.     As a result of these accommodations, by the spring of 2012 CRS's intercompany payable to TSE had grown to more than $14 million.  In May and July 2012, CRS and TSE entered into two agreements under which TSE accepted CRS common stock in satisfaction of $14.1 million owed to it by CRS.

34.     After July 2012, CRS's intercompany payable to TSE again accumulated and by year-end 2013 had grown to approximately $25 million ($10 million of which was classified by CRS as a current liability). TSE deferred payment of the non-current portion so that CRS would have working capital to finance acquisitions and cover its substantial overhead costs.

35.     As described in paragraphs 58-62 below, beginning in January 2014, Wells Fargo blocked CRS from repaying any intercompany indebtedness to TSE. By June 30, 2014, CRS's intercompany indebtedness to TSE had increased to more than $50 million, roughly $35 million of which was being classified by CRS as a current liability. By September 30, 2014, that intercompany indebtedness stood at more than $55 million, roughly $40 million of which was being classified by CRS as a current liability.

36.     TSE was a mere shell. All of its business, accounting and other corporate functions were performed by Tri-State Group entities.

37.     TSE never had the capital or liquidity needed to absorb losses on its contracts with the CRS Debtors or to make financial accommodations to the CRS Debtors. Instead, Tri-State Group entities caused TSE to "finance" these accommodations by failing to pay more than $100 million in payroll taxes.

**The Tri-State/TSE Accounts**

38.     TSE did not maintain a credit facility with Wells Fargo. However, both TSE and Tri-State maintained numerous bank accounts at Wells Fargo, including a number of accounts used to meet TSE payroll obligations.

39.     Virtually every business day, TSE's cash received from the CRS Debtors (described below) was transferred to Tri-State Group accounts, where TSE's funds were commingled with Tri-State Group funds and could be used by Tri-State Group and its insiders

for their own purposes. The Tri-State Group used no separate or segregated bank accounts for funds transferred from TSE to Tri-State Group companies.

40.     During the one year preceding TSE's bankruptcy alone, Tri-State caused more than $950 million to be transferred from TSE to Tri-State Group company accounts; during the two years preceding TSE's bankruptcy, Tri-State caused more than $1.7 billion to be transferred from TSE to Tri-State Group company accounts; and since 2011, Tri-State caused more than $2.5 billion to be transferred from TSE to Tri-State Group company accounts.

41.     With limited exceptions, the CRS Debtors made payments to TSE on a daily basis on account of payroll and similar obligations related to temporary workers for which TSE was acting as PEO. Virtually all payments from the CRS Debtors to TSE were made by wire or bank transfer from the CRS Debtors' accounts at Wells Fargo to TSE's account at J.P. Morgan Chase ("JPMC") ending in 669.

42.     Although some of the funds received from the CRS Debtors were directly used by TSE to meet TSE's payroll-related obligations, most of the funds (more than $2.0 billion since 2011) were immediately transferred by Tri-State Group employees from the TSE JPMC 669 account to a Tri-State account at JPMC ending in 505.

43.     Funds from Tri-State Group companies and other Robert Cassera-controlled companies also were deposited regularly into the Tri-State JPMC 505 account, where they were commingled with the proceeds of the transfers from the TSE JPMC 669 account.

44.     From the Tri-State 505 JPMC account, Tri-State Group employees moved some funds to a Tri-State account at Wells Fargo ending in 944 (the "Tri-State 944 Account"), and thereafter used those funds to meet some TSE payroll and payroll-related obligations.

45.     Tri-State Group employees also moved funds from the Tri-State 505 JPMC account to a TSE account at Santander Bank, where some of those funds were used for some TSE payroll-related expenses.  However, Tri-State Group employees also transferred funds directly from the Tri-State 505 JPMC account to other affiliates' accounts, and thereafter used those funds for purposes unrelated to TSE.

### The CRS Wells Fargo Loan Facility

46.     In 2010, in connection with the transition of some of Tri-State staffing businesses to CRS, Wells Fargo exited from its lending relationship with Tri-State and established a lending relationship with CRS.  Wells Fargo initially agreed to provide up to $50 million in receivables financing to the CRS Subsidiaries then in existence, plus an $18.5 million letter of credit in favor of Lumberman's Underwriters Association.  The amount of the CRS credit facility was increased from time to time, reaching a peak of $80 million in 2014.

47.     During 2010, CRS Subsidiaries began to enter into Account Purchase Agreements with Wells Fargo.  Additional CRS Subsidiaries thereafter entered into similar Account Purchase Agreements with Wells Fargo as they became CRS subsidiaries.  The terms of the Account Purchase Agreements were substantially similar; a representative Account Purchase Agreement, dated November 2, 2010, is attached hereto as Exhibit A.  Due to their volume, copies of all Account Purchase Agreements and the numerous amendments thereto, which are in possession of defendant Wells Fargo, and certain materially identical terms have not been attached as exhibits but are available from the Trustee upon request.

48.     The CRS-Wells Fargo relationship under the Account Purchase Agreements and their various amendments generally operated as follows: Wells Fargo would lend funds to the CRS Subsidiaries based upon an advance rate against eligible customer receivables, and in return would receive an assignment of or lien on the CRS Subsidiaries' accounts receivables (as well as

liens on other assets). CRS Subsidiaries' customer payments were directed to be sent to a lockbox, and receipts were applied daily against the outstanding loans. As CRS Subsidiary customer receivables were collected by Wells Fargo and new customer receivables were created and pledged to Wells Fargo, Wells Fargo advanced funds to the CRS Subsidiaries, typically on a daily basis based upon eligible customer receivables and other factors. As part of this arrangement, Wells Fargo handled the processing of and accounting for receipts of CRS Subsidiary customer receivables.

49.     The CRS Subsidiaries or CRS, in turn, remitted to TSE most of the proceeds of the Wells Fargo advances so that TSE could pay temporary workers' wages, employer taxes and workers' compensation expenses associated with employees supplied by TSE to the CRS Subsidiaries' customers.

50.     In connection with the loan facility, on August 27, 2010 CRS provided a Continuing Guaranty to Wells Fargo, whereby CRS guaranteed the obligations of all of its subsidiaries' obligations to Wells Fargo. On November 21, 2011, CRS and Wells Fargo entered into an Amended and Restated Continuing Guaranty, pursuant to which CRS continued to guarantee its subsidiaries' obligations to Wells Fargo. A copy of the Amended and Restated Continuing Guaranty is attached as Exhibit B. Importantly, neither guarantee included any guarantee of Tri-State Group or TSE obligations to Wells Fargo.

51.     Likewise, on August 27, 2010, Cassera entered into a Continuing Guaranty whereby Cassera guaranteed the obligations of CRS Subsidiaries under the various Account Purchase Agreements. Wells Fargo received similar cross-guarantees from Corporate Resource Development Inc. and Insurance Overload Services, Inc. on August 27, 2010; TS Staffing Services, Inc. on November 21, 2011; and Diamond Staffing Services, Inc. on January 31, 2011.

None of those guarantees included any guarantee of Tri-State Group or TSE obligations to Wells Fargo.

52.     Soon after the commencement of Wells Fargo's lending relationship with CRS, Wells Fargo personnel began to have concerns about the CRS loan facility and the CRS Debtors' financial performance.

53.     From 2011-2013, Wells Fargo monitored the CRS Debtors' financial performance, conducted field audits and reviewed financial information provided by the CRS Debtors.   That monitoring consistently showed that the CRS Debtors almost invariably overstated (and thus missed) their financial projections, and that CRS was heavily reliant on Cassera, Tri-State and TSE for liquidity and financial support in the form of forgiveness or deferral of intercompany indebtedness.   That monitoring also showed that tax liens had been asserted against TSE and Tri-State group for unpaid payroll taxes.

54.     The relationship between Wells Fargo and the CRS Debtors began to deteriorate significantly during the spring of 2013, when the CRS Debtors sought a three-year credit extension and an increase in the facility limit to $81.5 million despite missing their financial projections.   In June 2013, Wells Fargo decided not to give a long-term extension to the CRS Debtors, and instead began a pattern of much shorter extensions and tighter controls on the CRS Debtors.

55.     By August 2013, Wells Fargo internally was questioning the long-term viability of the CRS business model.   That same month, on August 27, 2013, Wells Fargo and the CRS Debtors amended the Account Purchase Agreements, whereby the CRS Debtors' credit facility was extended for four months—to December 31, 2013—and increased to $80 million but subject

to decrease at Wells Fargo's "sole discretion." The amendments also required the CRS Debtors to provide additional financial reporting.

56. On December 27, 2013—four days before the expiration of the credit facility—Wells Fargo and the CRS Debtors amended the facility again and extended it for only one month—to January 31, 2014.

57. In December 2013 or January 2014, Wells Fargo learned that some of the proceeds of Wells Fargo loan advances were being used for corporate acquisitions instead of to enhance liquidity, which Wells Fargo previously had informed the CRS Debtors was unacceptable. During early 2014, the CRS Debtors also failed to provide Wells Fargo with timely audited financial statements, and failed to timely make required filings with the SEC. Based on these developments, Wells Fargo determined to force CRS to find a replacement financing source.

58. Beginning in January 2014 with another set of amendments (and a mere ten-day extension) of the credit facility, Wells Fargo placed material constraints upon the CRS Debtors' use of cash; decreased the CRS Debtors' effective loan advance rates through reserve requirements and ineligible account restrictions; and blocked the CRS Debtors from repaying intercompany indebtedness to TSE. As a result of the block on repayment of intercompany indebtedness, CRS's unpaid intercompany indebtedness to TSE grew from $25 million to more than $55 million during 2014. The amendments also required that CRS retain a turnaround consultant recommended by Wells Fargo, which CRS did.

59. On February 10, 2014, the CRS Debtors and Wells Fargo entered into yet another set of amendments of the credit facility, extending the term of the credit facility through June 30, 2014. The amendments placed additional restrictions on the CRS Debtors.

60. In March 2014, Wells Fargo provided a formal notice of non-renewal to CRS, stating that the facility would be terminated effective July 1, 2014.

61. In May 2014, Wells Fargo became aware that CRS's new auditor was likely to issue an audit opinion with a going-concern qualification unless replacement financing was secured by the CRS Debtors. Wells Fargo became concerned about the impact a going-concern qualification might have upon Wells Fargo's loan, including its ability to realize on its primary collateral (CRS customer receivables). As a result, on June 20, 2014, ten days before the CRS audit opinion was to be issued, Wells Fargo rescinded its non-renewal notice and entered into amendments extending the CRS Debtors' credit facility for one year—to June 30, 2015 (the "Eleventh Amendments"). A representative copy of one of the Eleventh Amendments, all of which were substantially similar, is attached hereto as Exhibit C.

62. In reality, the Eleventh Amendments did not extend the credit facility for a one-year period. Instead, the credit facility was terminable at will by Wells Fargo upon 30-days' notice. The Eleventh Amendments also imposed large financial penalties and fees upon the CRS Debtors, including a $400,000-per-month "monitoring" fee which increased by $100,000 each month beginning September 1, 2014, a 0.25% facility fee and a $200,000 "amendment" fee, and continued to restrict the repayment of indebtedness to TSE. Several of these penalties and restrictions sprang into effect at the end of August 2014, the date by which the CRS Debtors had informed Wells Fargo they anticipated they would have a take-out financing source.

63. From late June 2014 through January 2015, pursuant the Eleventh Amendments, Wells Fargo assessed $3.6 million in monitoring and amendment fees, over and above interest expenses, other charges and reimbursement for actual costs incurred by Wells Fargo in connection the credit facility, and was paid those amounts by the CRS Debtors.

64.     In the fall of 2014, Wells Fargo began to seriously question TSE's ability to make financial accommodations to CRS. In November 2014, Wells Fargo demanded further amendments to the Account Purchase Agreements and required that the CRS Debtors cause TSE to submit to a field examination, and give Wells Fargo access to TSE's records regarding the payment of payroll taxes and workers compensation premiums.

65.     On December 3, 2014, the Account Purchase Agreements again were amended at Wells Fargo's insistence, and the CRS Debtors agreed to (1) allow Wells Fargo to engage, at the CRS Debtors' expense, Focus Management Group USA Inc. as a consultant to assist in monitoring the CRS Debtors and TSE; and (2) deliver to Wells Fargo up-to-date information regarding TSE's payment of payroll taxes. Wells Fargo's consultant investigated and reported on TSE's financial condition, including its payment of payroll taxes and workers compensation insurance obligations. The consultant reported that TSE's records reflected that TSE was current on its payroll tax obligations, but that the examination was inconclusive because a "Tax Guard" report ordered by Wells Fargo had not yet been received.

66.     On January 27, 2015, Wells Fargo received the Tax Guard report it had ordered in December 2014. The Tax Guard report showed $87 million in unpaid TSE payroll taxes ($78 million in payroll taxes and $9 million in penalties and interest). The next day, January 28, 2015, Cassera admitted that the Tax Guard report was accurate and disclosed to Wells Fargo that TSE also had not paid December 2014 payroll taxes of $26 million.

67.     Following receipt of this information, Wells Fargo immediately took action to liquidate its collateral and end its relationship with the CRS Debtors, and refused to provide any funding whatsoever to the CRS Debtors unless its demands were immediately met.

68. On January 30, 2015, Wells Fargo demanded (and CRS acceded to Wells Fargo's demand) that CRS enter into an Irrevocable Direction and Indemnification Agreement pursuant to which CRS agreed to be held responsible for overdrafts in any TSE bank accounts at Wells Fargo. Prior to that date, none of the CRS Debtors had guaranteed or been responsible for any TSE obligations to Wells Fargo, including any overdrafts in TSE accounts. A copy of the Irrevocable Direction and Indemnification Agreement is attached as Exhibit D.

69. Importantly, even the Irrevocable Direction and Indemnification Agreement executed under duress did not include a guarantee of any Tri-State Group obligations, or obligations of other Cassera-owned companies, to Wells Fargo, including obligations for any Tri-State Group overdrafts.

70. As further pre-conditions to any advances to the CRS Debtors, Wells Fargo demanded the immediate appointment of a Chief Restructuring Officer for CRS with extensive and exclusive powers, who was selected by Wells Fargo and was the same consultant that already was working for Wells Fargo; the immediate appointment of a Chief Restructuring Officer for TSE with extensive and exclusive powers, who again was selected by Wells Fargo; and that TSE immediately commence a bankruptcy case. The two chief restructuring officers ultimately charged the Debtors in excess of $2.8 million for their services.

71. Wells Fargo also demanded that the Account Purchase Agreements be amended to further increase the interest rates charged under the loan facility and to require the CRS Debtors to pay Wells Fargo an additional $500,000 "amendment" fee (together with the $3.6 million in fees already paid during the preceding months described in paragraphs 62-63 above, the "CRS Monitoring and Facility Fees"). This fee was "[i]n addition to all other fees, charges, interest and expenses" already levied by Wells Fargo. A copy of the letter agreement that Wells

Fargo required the CRS Debtors execute amending the Account Purchase Agreements is attached as Exhibit E.

72.     Wells Fargo instructed the CRS Chief Restructuring Officer it selected (its own consultant) that, among other things, he would "be the party [to] oversee the liquidation of CRS" and that "[n]o payments or transfers of any manner or description can be allowed to be sent to TSE by CRS without a full reconciliation by the CRO as well as the CRO's approval."

73.     In addition, Wells Fargo retained (at the CRS Debtors' expense) an additional entity to monitor CRS's and CRS Chief Restructuring Officer's collection of CRS accounts receivable, which cost the CRS Debtors in excess of $1.1 million.

**The TSE Bankruptcy**

74.     On Monday, February 2, 2015 (the "TSE Petition Date"), TSE filed a petition for relief in this Court.

75.     The prior business day, Friday, January 30, 2015, Wells Fargo had permitted roughly $2.5 million in payroll checks presented for payment on TSE's primary payroll accounts at Wells Fargo to be honored.  These TSE payroll accounts at Wells Fargo were "zero-balance" accounts which, as part of the conduct described in paragraphs 38 to 45 above, often had been funded using transfers from the Tri-State 944 Account.

76.     On January 30, 2015, Wells Fargo also had permitted roughly $2.5 million to be transferred from the Tri-State 944 Account to fund the TSE payroll accounts.  Tri-State, however, did not move any of the funds available in Tri-State accounts at other banks to Tri-State 944 Account on that date, resulting in a large negative balance in the Tri-State 944 Account.

77.     As a result of the foregoing, on the TSE Petition Date TSE's payroll accounts maintained at Wells Fargo had a small positive balance, and TSE payroll checks presented for

payment prior to or on the TSE Petition Date already had been honored. The Tri-State 944 Account, however, reflected a $2,544,849.68 overdraft (negative) balance as of the close of business on the TSE Petition Date, and Tri-State was obligated to pay this overdraft to Wells Fargo.

78.     On the TSE Petition Date, TSE filed a first-day motion seeking Court permission to pay pre-petition temporary worker payroll obligations (TSE Dkt. No. 3). In the motion, TSE represented that it "has been advised that upon entry of an order approving this Motion, Wells Fargo will permit CRS to make payment of current pre-petition Employee Obligations to [TSE] in order to allow [TSE] to pay the Employee Obligation due on January 30, 2015 … and the upcoming February 6, 2016 payroll dates…." (TSE Dkt. No. 3 at ¶ 8). "Employee Obligations" were defined in the motion as "pre-petition wages and salaries and other compensation and benefits of the Employees." (TSE Dkt. No. 3 at ¶ 2).

79.     TSE further represented in its motion, *inter alia*, that a failure to pay pre-petition wages of the Employees "will irreparably impair employee morale at the very time when the dedication, confidence and cooperation of these Employees are most critical" and that "the Employees will suffer undue hardship and likely financial difficulties" if the payments were not authorized. (TSE Dkt. No. 3 at ¶¶ 3-4).

80.     There was no mention in TSE's first-day motion of the pre-existing overdraft in the Tri-State 944 Account; that substantially all of the TSE employee obligations due on January 30, 2015 already had been paid pre-petition; or that in addition to employee obligations CRS also would be paying Wells Fargo for overdrafts in Tri-State accounts.

81.     On February 5, 2015, this Court entered an order granting TSE's first-day payroll motion. The Court's order authorized "Employee Obligations" to be paid, and only then subject to the limits in Bankruptcy Code § 507(a)(4) and (5). (TSE Dkt. No. 9).

82.     On February 5, 2015, Wells Fargo made $2,572,570.26 in advances to the CRS Debtors under the loan facility for purposes of satisfying overdrafts in the Tri-State 944 Account. Those funds were included as part of the approximately $9 million credited to CRS's account that day, and that amount ($2,572,570.26) was immediately credited to the Tri-State 944 Account at Wells Fargo (the "February 5, 2015 Transfer").

83.     Approximately three weeks later, on or about February 24, 2015, Wells Fargo opened an account in TSE's name ending in 2002 (the "TSE 2002 Account"). Wells Fargo did so without the knowledge or permission of TSE's Chief Restructuring Officer, and without informing the Trustee who was appointed three days later (on February 27, 2015) and discovered the existence of the account several months later.

84.     From March through July 2015, Wells Fargo charged more than $500,000 in what Wells Fargo characterized to be "Client Analysis Service Charges" to the TSE 2002 Account. Notwithstanding requests from the Trustee and TSE's Chief Restructuring Officer for information, Wells Fargo failed to explain these charges, other than to assure them that these were "standard" bank charges and/or that they were being "reversed."

85.     The Client Analysis Service Charges caused overdraft (negative) balances in the TSE 2002 Account, which had no other activity.

86.     On June 30, 2015, Wells Fargo recorded $430,269.86 in advances to the CRS Debtors' credit facility, and applied that amount against the overdraft in the TSE 2002 Account caused by Wells Fargo's Client Analysis Service Charges.

87. On July 1, 2015, Wells Fargo recorded an additional $100,000.00 in advances to the CRS Debtors' credit facility, and again applied that amount against the overdraft in the TSE 2002 Account caused by Wells Fargo's Client Analysis Service Charges (together with the $430,269.86 in advances identified in the preceding paragraph, the "Cassera Entity Loan Charges").

88. On July 23, 2015 (the "CRS Petition Date"), the CRS Debtors commenced bankruptcy proceedings in Delaware. The Trustee is informed and believes that the CRS Debtors commenced bankruptcy proceedings in Delaware in order to avoid this Court's jurisdiction.

89. On August 21, 2015, the Court ordered that the CRS Debtors' bankruptcy cases be transferred to this District. On September 22, 2015, Mr. Feltman was appointed chapter 11 trustee for the CRS Debtors' estates.

90. In 2017, the Trustee learned that $367,811 of the "Client Analysis Service Charges" in reality were charges related to accounts maintained at Wells Fargo by Tri-State Group entities or other Cassera-owned companies (collectively, the "Cassera Entities"), which the Debtors had no obligation (and TSE had no Court permission) to pay. An additional $56,520 in charges were for expenses that were never actually incurred by the Debtors (together with the $367,811 in charges, the "Cassera Entity Post-Petition Charges").

91. On and after the TSE Petition Date, Wells Fargo also recorded $1,388,744 in loan advances to the CRS Debtors' loan facility on account of its legal fees, and reimbursed itself for those fees. Wells Fargo also reimbursed itself for more than $300,000 in legal fees from the Wells Fargo Retained Cash Collateral, as defined in the Stipulation and Order entered in *Feltman v. Wells Fargo Bank, N.A.*, Adv. No. 15-01391, Dkt. 21.

92.     The Trustee is informed and believes that a material portion of legal fees described in the foregoing paragraph related to legal advice and consultation concerning the February 5, 2015 Transfer, the Cassera Entity Loan Charges, the Cassera Entity Post-Petition Charges, the WFFL Lease Buyout Payment (as defined in Count XVI below), and other charges relating to Wells Fargo's analysis and enforcement of its rights against Cassera Entities for which Wells Fargo was not and is not entitled to reimbursement or indemnification under any of its agreements with the Debtors (the "Unrelated Legal Charges").

93.     The CRS Debtors' agreements with Wells Fargo do not permit Wells Fargo to impose charges against the CRS Debtors' related to legal and other expenses incurred pursuing obligations owed to Wells Fargo by Cassera Entities, or obligations owed by any of the Debtors to WFFL.

94.     For example, in each of the Account Purchase Agreements, each CRS Subsidiary agreed:

> In addition to the payment of expenses pursuant to Section 11.19, the Customer shall indemnify, defend and hold harmless [Wells Fargo], and any of its participants, parent entities, subsidiary entities, affiliated entities, successor entities, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any and all liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) *arising out of or otherwise relating to this Agreement, any Related Document, the transactions contemplated hereby and thereby, any Purchased Account, any Related Rights, any Collateral*, any action taken or omitted by any of the Indemnitees, any actions to be performed by the Customer hereunder or otherwise, or in connection with any of the foregoing, any investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, the purchase of Accounts, the use or intended use of the proceeds of the payments made to the Customer….

****

Notwithstanding the foregoing, the Customer shall not be obligated to indemnify any Indemnitee for (A) any Indemnified Liability caused directly by the gross negligence or willful misconduct of such Indemnitee….

Ex. A, § 11.07 (emphasis supplied).  Section 11.19 of each of the applicable Account Purchase Agreements further provided that each CRS Subsidiary:

agrees to pay on demand all costs and expenses, including reasonable attorneys' fees (including in-house counsel), *incurred by [Wells Fargo] in connection with this Agreement, any other Related Document, the Related Rights and the transactions contemplated hereby and thereby*, including all such costs, expenses and fees incurred in connection with the negotiation, due diligence, preparation, execution, amendment, modification, administration, performance, collection and enforcement of this Agreement, the Related Documents, the Related Rights, all obligations of the Customer hereunder and thereunder and the creation, perfection, protection, satisfaction, foreclosure or enforcement of any security interest granted hereunder and the collection of any Purchased Account, any Related Right or any obligation owed by the Customer to [Wells Fargo]."

Ex. A, § 11.19 (emphasis supplied).  "Related Document" was defined in the Account Purchase Agreements as "any agreement, document, exhibit, notice or other written communication to which the Customer is a party or which has at any time been delivered by or on behalf of the Customer to [Wells Fargo] in connection with this Agreement, including each Guaranty and each guaranty by the Customer in favor of [Wells Fargo].  Ex. A, § 2.40.

95.     In addition, substantially all amendments to the Account Purchase Agreements provided that the applicable CRS Subsidiary shall "pay or reimburse [Wells Fargo] on demand for all costs and expenses incurred by [Wells Fargo] *in connection with the Account Purchase Agreement and the Related Documents,* including without limitation all disbursements and reasonable fees of counsel."  Ex. C, ¶ 10 (emphasis supplied).

96.     Nowhere did the Account Purchase Agreements, any amendments thereto or any other agreement permit Wells Fargo to charge the CRS Subsidiaries for Wells Fargo's legal and other expenses incurred pursuing obligations owed under Wells Fargo's agreements with Cassera

Entities, or with respect to obligations owed by any of the Debtors to WFFL (a different legal entity) under the copier leases.

97.     Similarly, in the Amended and Restated Continuing Guaranty, CRS guaranteed all of the CRS Subsidiaries' "obligations" to Wells Fargo. "Obligations" was defined as "any and all debts, obligations and liabilities of each Obligor to [Wells Fargo], whether incurred in the past, present or future, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether or not such Obligor may be liable individually or jointly or jointly and severally with others, or whether recovery upon such Obligations may subsequently become unenforceable." Ex. B, ¶ 1.

98.     CRS did not guarantee in the Amended And Restated Continuing Guaranty, or in any other agreement, payment of Wells Fargo legal and other expenses incurred pursuing obligations owed to Wells Fargo by Cassera Entities (which were not CRS Debtor "obligations"), nor did CRS guarantee obligations owed by the any of the Debtors to WFFL (a different legal entity from Wells Fargo).

## COUNT I

**Avoidance and Recovery of Constructive Fraudulent Transfer
Pursuant to §§ 548 and 550(a) of the Bankruptcy Code (CRS's Estate)**

99.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein,

100.    The February 5, 2015 Transfer constituted a transfer of interests in CRS's property.

101.    The February 5, 2015 Transfer was made to or for the benefit of Wells Fargo because it was made to Wells Fargo, and directly satisfied and paid the overdraft in Tri-State Acct. No. 944 at Wells Fargo.

102.    CRS was not obligated under any agreement to pay or satisfy any obligation of Tri-State to Wells Fargo.

103.    CRS received less than reasonably equivalent value in exchange for the February 5, 2015 Transfer.  In fact, CRS received no value for the transfer inasmuch as the February 5, 2015 Transfer paid for a debt of Tri-State, and not CRS.

104.    CRS was insolvent on the date the February 5, 2015 Transfer was made.

105.    On the date that the February 5, 2015 Transfer was made, CRS was engaged in business or a transaction, or was about to engage in business or a transaction, for which CRS's remaining property was unreasonably small capital.

106.    On the date that the February 5, 2015 Transfer was made, CRS intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

107.    The Trustee may avoid the February 5, 2015 Transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

108.    Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of February 5, 2015 Transfer, for the benefit of CRS's estate, from Wells Fargo, the entity to or for whose benefit the February 5, 2015 Transfer was made.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding the February 5, 2015 Transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code; (b)  entering judgment against Wells Fargo pursuant to section

550(a)(1) of the Bankruptcy Code in the amount of the February 5, 2015 Transfer; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT II

### Avoidance and Recovery of Actual Fraudulent Transfer
### Pursuant to §§ 548 and 550(a) of the Bankruptcy Code (CRS Estate)

109.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

110.    The February 5, 2015 Transfer constituted a transfer of an interest in CRS's property.

111.    The February 5, 2015 Transfer was made to or for the benefit of Wells Fargo because it was made to Wells Fargo, and directly satisfied and paid the overdraft in Tri-State Acct. No. 944 at Wells Fargo.

112.    The February 5, 2015 Transfer was made with the actual intent to hinder, delay or defraud CRS's creditors.  The parties responsible for making the transfer knew that CRS was insolvent, that CRS was not responsible for any of Tri-State's obligations, and that the natural result of the transfer would be to hinder, delay or defraud creditors of CRS who otherwise would entitled to be paid with those funds during the course of CRS's liquidation.

113.    The Trustee may avoid the February 5, 2015 Transfer pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

114.    Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of February 5, 2015 Transfer, for the benefit of CRS's estate, from Wells Fargo, the entity to or for whose benefit the February 5, 2015 Transfer was made.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding the February 5, 2015 Transfer pursuant to section 548(a)(1)(A) of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the February 5, 2015 Transfer; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper

## COUNT III

### Avoidance and Recovery of Constructive Fraudulent Transfer
### Pursuant to N.Y. DCL §§ 273- 275, 278 and 279, and
### §§ 544(b)(1) and 550(a) of the Bankruptcy Code (CRS Estate)

115.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

116.    The February 5, 2015 Transfer constituted a transfer of an interest in CRS's property.

117.    The February 5, 2015 Transfer was made, mediately or immediately, by CRS to Wells Fargo.

118.    The February 5, 2015 Transfer was made by CRS without fair consideration.  In fact, CRS received no consideration for the transfer, as the February 5, 2015 Transfer paid for a debt of Tri-State and not CRS.

119.    CRS was insolvent on the date that the February 5, 2015 Transfer was made, or was rendered insolvent as a result of the February 5, 2015 Transfer.

120.    On the date that the February 5, 2015 Transfer was made, CRS was engaged in business or transaction, or was about to engage in business or transaction, for which CRS's remaining property was unreasonably small capital.

121. On the date that the February 5, 2015 Transfer was made, CRS intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

122. Actual creditors, including but not limited to the Internal Revenue Service and other taxing authorities, exist who could have the February 5, 2015 Transfer set aside, or disregard the February 5, 2015 Transfer and attach or levy execution upon the property conveyed, pursuant to section 278 and/or 279 of the New York Debtor and Creditor Law ("N.Y. DCL").

123. The Trustee may avoid the February 5, 2015 Transfer pursuant to section 544(b)(1) of the Bankruptcy Code.

124. Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the February 5, 2015 Transfer, for the benefit of CRS's estate, from Wells Fargo, the entity to or for whose benefit the February 5, 2015 Transfer was made.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding the February 5, 2015 Transfer pursuant to N.Y. DCL § 278 and/or 279 and section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the February 5, 2015 Transfer; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT IV

**Avoidance and Recovery of Actual Fraudulent Transfer
Pursuant to N.Y. DCL §§ 276, 278 and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (CRS Estate)**

125. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

126.     The February 5, 2015 Transfer constituted a transfer of an interest in CRS's property.

127.     The February 5, 2015 Transfer was made, mediately or immediately, by CRS to Wells Fargo.

128.     The February 5, 2015 Transfer was made with the actual intent to hinder or delay present or future creditors of CRS within the meaning of section 276 of the N.Y. DCL.  The parties responsible for making the transfer knew that CRS was insolvent, that CRS was not responsible for any of Tri-State's obligations, and that the natural result of the transfer would be to hinder, delay or defraud creditors of CRS who otherwise would entitled to be paid with those funds during the course of CRS's liquidation.

129.     Actual creditors, including but not limited to the Internal Revenue Service and other taxing authorities, exist who could have the February 5, 2015 Transfer set aside, or disregard the February 5, 2015 Transfer and attach or levy execution upon the property conveyed, pursuant to section 278 and/or 279 of the N.Y. DCL.

130.     The Trustee may avoid the February 5, 2015 Transfer pursuant to section 544(b)(1) of the Bankruptcy Code.

131.     Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the February 5, 2015 Transfer, for the benefit of the CRS estate, from Wells Fargo, the entity to or for whose benefit the February 5, 2015 Transfer was made.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding the February 5, 2015 Transfer  pursuant to N.Y. DCL § 278 and/or 279 and section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the February 5,

2015 Transfer; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT V

Action to Remedy Violation of the Automatic Stay
**Pursuant** to § 362 of the Bankruptcy Code (TSE Estate)

132.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

133.    Upon the TSE Petition Date, section 362(a)(3) of the Bankruptcy Code operated as a stay against any action to obtain possession of property of TSE's estate or property from TSE's estate or to exercise control over property of TSE's estate.

134.    Upon the TSE Petition Date, section 362(a)(6) of the Bankruptcy Code operated as a stay against any action to collect, assess or recover a claim against TSE that arose before the TSE Petition Date.

135.    By assessing the Cassera Entity Post-Petition Charges against TSE's accounts, Wells Fargo knowingly and willfully violated sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

136.    The Cassera Entity Post-Petition Charges are void, or voidable by the Court, as violations of the automatic stay imposed by sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) declaring the Cassera Entity Post-Petition Charges to be a nullity and void, (b) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (c) granting such other equitable relief as may be just and proper.

## COUNT VI

### Avoidance and Recovery of Unauthorized Post-Petition Transfers
### Pursuant to §§ 549 and 550(a) of the Bankruptcy Code (TSE Estate)

137.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

138.    Following the TSE Petition Date and continuing through July 2015, Wells Fargo assessed the Cassera Entity Post-Petition Charges against TSE's account.

139.    Section 549 of the Bankruptcy Code allows a trustee to avoid transfers of property of the estate that occur after the commencement of the case and that are not authorized by the Bankruptcy Code or the Court.

140.    The Cassera Entity Post-Petition Charges constituted transfers of property of TSE's estate, were not authorized by the Court or Bankruptcy Code, and may be avoided under section 549 of the Bankruptcy Code.

141.    Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the Cassera Entity Post-Petition Charges, for the benefit of the TSE estate, from Wells Fargo, the entity to or for whose benefit the Cassera Entity Post-Petition Charges were made.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) declaring the Cassera Entity Post-Petition Charges to be unauthorized transfers pursuant to section 549 of the Bankruptcy Code; (b) avoiding the Cassera Entity Post-Petition Charges pursuant to section 549 of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the Cassera Entity Post-Petition Charges; (d) awarding Plaintiff pre- and post-judgment interest, costs, and

attorneys' fees and expenses; and (e) granting such other equitable relief as may be just and proper.

## COUNT VII

### Breach of Contract (TSE Estate)

142.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

143.     TSE's agreements with Wells Fargo did not permit Wells Fargo to impose charges against TSE for obligations owed to Wells Fargo by Cassera Entities.

144.     Wells Fargo materially breached TSE's agreements with Wells Fargo by assessing the Cassera Entity Post-Petition Charges to TSE's accounts.

145.     As a direct result of Wells Fargo's breaches of TSE's agreements with Wells Fargo, TSE's estate has suffered, and continues to suffer, substantial damages.

146.     TSE has performed all of its obligations under its agreements with Wells Fargo, other than those whose performance is excused by the Bankruptcy Code and this Court's orders.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Cassera Entity Post-Petition Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT VIII

### Unjust Enrichment (TSE Estate)

147.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

148.     Wells Fargo purposefully assessed and collected the Cassera Entity Post-Petition Charges knowing it was not entitled, and that it would be improper, to do so.

149.     Wells Fargo was unjustly enriched by its receipt of the Cassera Entity Post-Petition Charges.

150.     TSE's estate has suffered, and continues to suffer, substantial damages as a result of Wells Fargo's collection of the Cassera Entity Post-Petition Charges that TSE had no obligation or Court authority to pay.

151.     Equity and good conscience do not permit Wells Fargo to retain the Cassera Entity Post-Petition Charges.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Cassera Entity Post-Petition Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT IX

**Avoidance and Recovery of Constructive Fraudulent Transfer**
**Pursuant to §§ 548 and 550(a) of the Bankruptcy Code (CRS Debtors)**

152.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

153.     The Cassera Entity Loan Charges constituted transfers of interests in the CRS Debtors' property.

154.     The Cassera Entity Loan Charges were made to or for the benefit of Wells Fargo.

155.     The CRS Debtors received less than reasonably equivalent value in exchange for the Cassera Entity Loan Account Charges.

156.     The CRS Debtors were insolvent on the dates the Cassera Entity Loan Charges were made.

157.    On the dates that the Cassera Entity Loan Charges were made, the CRS Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which their remaining property was unreasonably small capital.

158.    On the dates that the Cassera Entity Loan Charges were made, the CRS Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

159.    The Trustee may avoid the Cassera Entity Loan Charges pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

160.    Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the Cassera Entity Loan Charges, for the benefit of the CRS Debtors' estates, from Wells Fargo, the entity to or for whose benefit the Cassera Entity Loan Charges were made.

161.    Pursuant to section 550(a)(2) of the Bankruptcy Code, the Trustee may recover the value of the Cassera Entity Loan Charges, for the benefit of the CRS Debtors' estates, from Wells Fargo, as the immediate or mediate transferee.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter an Order (a) avoiding Cassera Entity Loan Charges pursuant to section 548(a)(1)(B) of the Bankruptcy Code; (b)  entering judgment against Wells Fargo pursuant to section 550(a)(1) or 550(a)(2) of the Bankruptcy Code in the amount of the Cassera Entity Loan Account Charges; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

<u>COUNT X</u>

**Avoidance and Recovery of Constructive Fraudulent Transfer
Pursuant to N.Y. DCL §§ 273- 275, 278 and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (CRS Estate)**

162.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

163.    The Cassera Entity Loan Charges constituted transfers of interests in the CRS Debtors' property.

164.    The Cassera Entity Loan Charges were made to or for the benefit of Wells Fargo.

165.    The CRS Debtors did not receive fair consideration in exchange for the Cassera Entity Loan Charges.

166.    The CRS Debtors were insolvent on the dates the Cassera Entity Loan Charges were made.

167.    On the dates that the Cassera Entity Loan Charges were made, the CRS Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which their remaining property was unreasonably small capital.

168.    On the dates that the Cassera Entity Loan Charges were made, the CRS Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

169.    Actual creditors, including but not limited to the Internal Revenue Service and other taxing authorities, exist who could have the Cassera Entity Loan Charges set aside, or disregard the Cassera Entity Loan Charges and attach or levy execution upon the property conveyed, pursuant to section 278 and/or 279 of the N.Y. DCL.

170.    The Trustee may avoid the Cassera Entity Loan Charges pursuant to section 544(b)(1) of the Bankruptcy Code.

171.     Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the Cassera Entity Loan Charges, for the benefit of the CRS Debtors' estates, from Wells Fargo, the entity to or for whose benefit the Cassera Entity Loan Charges was made.

172.     Pursuant to section 550(a)(2) of the Bankruptcy Code, the Trustee may recover the value of the Cassera Entity Loan Charges, for the benefit of the CRS Debtors' estates, from Wells Fargo, as the immediate or mediate transferee.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding Cassera Entity Loan Charges pursuant to section 544(b) of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) or 550(a)(2) of the Bankruptcy Code in the amount of the Cassera Entity Loan Account Charges; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT XI

### Breach of Contract (CRS Debtors' Estates)

173.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

174.     The CRS Debtors' agreements with Wells Fargo did not permit Wells Fargo to impose charges upon CRS's accounts related to obligations owed to Wells Fargo by Cassera Entities.

175.     Wells Fargo materially breached the CRS Debtors' agreements with Wells Fargo by assessing the Cassera Entity Loan Charges against CRS's accounts.

176.     As a direct result of Wells Fargo's breaches of the CRS Debtors' agreements with Wells Fargo, CRS has suffered, and continues to suffer, substantial damages.

177. The CRS Debtors have performed all of their obligations under the CRS Debtors' agreements with Wells Fargo, other than those whose performance is excused by the Bankruptcy Code and this Court's orders.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Cassera Entity Loan Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT XII

### Conversion (CRS Debtors)

178. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

179. Wells Fargo wrongfully assessed the Cassera Entity Loan Charges against the CRS Debtors' credit facility, and collected those charges from the CRS Debtors' property.

180. Wells Fargo wrongfully retains possession of the proceeds of the CRS Debtors' property.

181. Wells Fargo has converted the CRS Debtors' property and the proceeds thereof.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Cassera Entity Loan Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper

## COUNT XIII

### Unjust Enrichment (CRS Estate)

182. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

183.    Wells Fargo purposefully assessed and collected the Cassera Entity Loan Charges knowing it was not entitled, and that it would be improper, to do so.

184.    Wells Fargo was unjustly enriched by its receipt of the Cassera Entity Loan Charges.

185.    The CRS Debtors' estates have suffered, and continues to suffer, substantial damages as a result of Wells Fargo's collection of the Cassera Entity Loan Charges that the CRS Debtors had no obligation to pay.

186.    Equity and good conscience do not permit Wells Fargo to retain the payments it received on account of the Cassera Entity Loan Charges.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Cassera Entity Loan Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT XIV

**Avoidance and Recovery of Constructive Fraudulent Transfer
Pursuant to §§ 548 and 550(a) of the Bankruptcy Code (CRS Debtors' Estates)**

187.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

188.    The payments of the CRS Monitoring and Facility Fees constituted transfers of interests in the CRS Debtors' property.

189.    The CRS Monitoring and Facility Fees were paid and transferred to Wells Fargo.

190.    The CRS Debtors received less than reasonably equivalent value in exchange for the CRS Monitoring and Facility Fees.

191.    The CRS Debtors making the transfers of CRS Monitoring and Facility Fees were insolvent on the dates the CRS Monitoring and Facility Fees were paid.

192.    On the dates that the CRS Monitoring and Facility Fees were paid, the CRS Debtors making the transfers of CRS Monitoring and Facility Fees were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which their remaining property was unreasonably small capital.

193.    On the dates that the CRS Monitoring and Facility Fees were paid, the CRS Debtors making the transfers of CRS Monitoring and Facility Fees intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

194.    The Trustee may avoid the payment of the CRS Monitoring and Facility Fees pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

195.    Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the CRS Monitoring and Facility Fees, for the benefit of the CRS Debtors' estates, from Wells Fargo, the entity to which the CRS Monitoring and Facility Fees were paid.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors' estates, respectfully requests that the Court enter an Order (a) avoiding the payment of CRS Monitoring and Facility Fees pursuant to section 548(a)(1)(B) of the Bankruptcy Code; (b)  entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the CRS Monitoring and Facility Fees; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT XV

**Avoidance and Recovery of Constructive Fraudulent Transfer
Pursuant to N.Y. DCL §§ 273- 275, 278 and 279, and
§§ 544(b)(1) and 550(a) of the Bankruptcy Code (CRS Debtors' Estates)**

196.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

197.    The payments of the CRS Monitoring and Facility Fees constituted transfers of interests in the CRS Debtors' property.

198.    The CRS Monitoring and Facility Fees were paid and transferred to Wells Fargo.

199.    The CRS Debtors did not receive fair consideration in exchange for the CRS Monitoring and Facility Fees.

200.    The CRS Debtors making the transfers of CRS Monitoring and Facility Fees were insolvent on the dates the CRS Monitoring and Facility Fees were paid.

201.    On the dates that the CRS Monitoring and Facility Fees were paid, the CRS Debtors making the transfers of CRS Monitoring and Facility Fees were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which their remaining property was unreasonably small capital.

202.    On the dates that the CRS Monitoring and Facility Fees were paid, the CRS Debtors making the transfers of CRS Monitoring and Facility Fees intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

203.    Actual creditors, including but not limited to the Internal Revenue Service and other taxing authorities, exist who could have the CRS Monitoring and Facility Fees set aside, or disregard the CRS Monitoring and Facility Fees and attach or levy execution upon the property conveyed, pursuant to section 278 and/or 279 of the N.Y. DCL.

204. The Trustee may avoid the CRS Monitoring and Facility Fees pursuant to section 544(b)(1) of the Bankruptcy Code.

205. Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the CRS Monitoring and Facility Fees, for the benefit of the CRS Debtors' estates, from Wells Fargo, the entity to which the CRS Monitoring and Facility Fees were paid.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors' estates, respectfully requests that the Court enter an Order (a) avoiding the payment of CRS Monitoring and Facility Fees pursuant to section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the CRS Monitoring and Facility Fees; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT XVI

### Avoidance and Recovery of Preferential Transfers to WFFL
### Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code (CRS)

206. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

207. On or about June 30, 2017, CRS transferred $240,220 to WFFL to pay off 17 copiers that were leased from WFFL (the "WFFL Lease Buyout Payment").

208. The WFFL Lease Buyout Payment constituted a transfer of an interest in CRS's property.

209. The WFFL Lease Buyout Payment was made to WFFL.

210. The WFFL Lease Buyout Payment was made on account of antecedent debt owed by CRS to WFFL before the WFFL Lease Buyout Payment was made.

211. The WFFL Lease Buyout Payment was made while CRS was insolvent.

212. The WFFL Lease Buyout Payment was made within 90 days before July 23, 2015, the date CRS filed its chapter 11 bankruptcy petition (the "CRS Petition Date").

213. The value of the copiers that were the subject of the WFFL Lease Buyout Payment was a fraction of amount of the WFFL Lease Buyout Payment.

214. The WFFL Lease Buyout Payment enabled WFFL to receive more than it would have received if CRS's case were a case under chapter 7 of the Bankruptcy Code, the WFFL Lease Buyout Payment had not been made, and WFFL received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

215. The Trustee may avoid the WFFL Lease Buyout Payment pursuant to section 547(b) of the Bankruptcy Code.

216. Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the WFFL Lease Buyout Payment, for the benefit of the CRS estate, from WFFL, the entity to which the WFFL Lease Buyout Payment was made.

WHEREFORE, Plaintiff, as chapter 11 trustee of CRS, respectfully requests that the Court enter an Order (a) avoiding the WFFL Lease Buyout Payment pursuant to section 547(b) of the Bankruptcy Code; (b) entering judgment against WFFL pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the WFFL Lease Buyout Payment; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT XVII

### Action to Remedy Violation of the Automatic Stay
### Pursuant to § 362 of the Bankruptcy Code (CRS Debtors)

217.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

218.    Upon the CRS Petition Date, section 362(a)(3) of the Bankruptcy Code operates as a stay against any action to obtain possession of property of the CRS Debtors' estates or property from the CRS Debtors' estates or to exercise control over property of the CRS Debtors' estate.

219.    Upon the CRS Petition Date, section 362(a)(6) of the Bankruptcy Code operates as a stay against any action to collect, assess or recover a claim against the CRS Debtors that arose before the CRS Petition Date.

220.    On and after the CRS Petition Date, Wells Fargo assessed and collected from the CRS Debtors and their property the Unrelated Legal Charges.

221.    The CRS Debtors' agreements with Wells Fargo did not permit Wells Fargo to impose charges upon the CRS Debtors related to obligations owed to Wells Fargo by Cassera Entities, or for obligations owed by the any of Debtors to WFFL.

222.    By assessing and collecting the Unrelated Legal Charges against the CRS Debtors, Wells Fargo knowingly and willfully violated sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

223.    The Unrelated Legal Charges are void, or voidable by the Court, as violations of automatic stay imposed by sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter an Order (a) declaring the Unrelated Legal Charges to be a nullity and void,

(b) entering judgment directing the return of the amount of the Unrelated Legal Charges to the CRS Debtors' estates; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT XVIII

**Avoidance and Recovery of Unauthorized Post-Petition Transfers**
**Pursuant to §§ 549 and 550(a) of the Bankruptcy Code (CRS Debtors)**

224. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

225. Following the CRS Petition Date and continuing through the date of this Complaint, Wells Fargo has assessed Unrelated Legal Charges and collected them from the CRS Debtors' property on multiple occasions.

226. Section 549 of the Bankruptcy Code allows a trustee to avoid transfers of property of the estate that occur after the commencement of the case and that are not authorized by the Bankruptcy Code or the Court.

227. The Unrelated Legal Charges against the CRS Debtors constitute transfers of property of the CRS Debtors' estates, were not authorized by the Court or Bankruptcy Code, and may be avoided under section 549 of the Bankruptcy Code.

228. Pursuant to section 550(a)(1) of the Bankruptcy Code, the Trustee may recover the value of the Unrelated Legal Charges assessed and collected by Wells Fargo, for the benefit of the CRS Debtors' estates, from Wells Fargo.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors' estates, respectfully requests that the Court enter an Order (a) declaring the Unrelated Legal Charges to be unauthorized transfers pursuant to section 549 of the Bankruptcy Code; (b) avoiding the

Unrelated Legal Charges pursuant to section 549 of the Bankruptcy Code; (c) entering judgment against Wells Fargo pursuant to section 550(a)(1) of the Bankruptcy Code in the amount of the Unrelated Legal Expense Charges; (d) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (e) granting such other equitable relief as may be just and proper.

## COUNT XIX

### Breach of Contract (CRS Debtors)

229.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

230.     The CRS Debtors' agreements did not permit Wells Fargo to impose charges against the CRS Debtors for legal and other expenses incurred pursuing obligations owed to Wells Fargo by Cassera Entities, or obligations owed by any of the Debtors to WFFL.

231.     Wells Fargo breached the CRS Debtors' agreements with Wells Fargo by charging Unrelated Legal Charges to the CRS Debtors' loan accounts and reimbursing itself using the CRS Debtors' property.

232.     As a direct result of Wells Fargo's breaches of the CRS Debtors' agreements with Wells Fargo, the CRS Debtors have suffered, and continues to suffer, substantial damages.

233.     The CRS Debtors have performed all of their obligations under their agreements with Wells Fargo, other than those whose performance is excused by the Bankruptcy Code and this Court's orders.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Unrelated Legal Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT XX

### Conversion (CRS Debtors)

234.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

235.    Wells Fargo wrongfully assessed the Unrelated Legal Charges against the CRS Debtors' accounts, and collected the charges from the CRS Debtors' property.

236.    Wells Fargo wrongfully retains possession of the proceeds of the CRS Debtors' property.

237.    Wells Fargo has converted the CRS Debtors' property and the proceeds thereof.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Unrelated Legal Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

## COUNT XXI

### Unjust Enrichment (CRS Debtors)

238.    Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

239.    Wells Fargo purposefully assessed and collected the Unrelated Legal Charges knowing it was not entitled to assess those charges, and that it would be improper to do so.

240.    Wells Fargo was unjustly enriched by its receipt of the Unrelated Legal Charges.

241.    The CRS Debtors' estates have suffered, and continue to suffer, substantial damages as a result of Wells Fargo's collection of the Unrelated Legal Charges that the CRS Debtors had no obligation to pay.

242.     Equity and good conscience do not permit Wells Fargo to retain the payments it received on account of the Unrelated Legal Charges.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter judgment against Wells Fargo in the amount of the Unrelated Legal Charges; award Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and grant such other equitable relief as may be just and proper.

**COUNT XXII**

**Recovery of Wells Fargo Retained Cash Collateral (CRS Debtors)**

243.     Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

244.     Pursuant to the Stipulation and Order entered in *Feltman v. Wells Fargo Bank, N.A.*, Adv. No. 15-01391, Dkt. 21, Wells Fargo was authorized to retain the Wells Fargo Retained Cash Collateral, as that term is defined therein, on the terms and conditions set forth in that Stipulation and Order.

245.     In addition, a $1.5 million Stipulation Reserve Account (as defined in the foregoing Stipulation) was created for the benefit of Wells Fargo.

246.     Under the Account Purchase Agreements, each CRS Subsidiary agreed:

In addition to the payment of expenses pursuant to Section 11.19, the Customer shall indemnify, defend and hold harmless [Wells Fargo], and any of its participants, parent entities, subsidiary entities, affiliated entities, successor entities, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any and all liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel) arising out of or otherwise relating to this Agreement, any Related Document, the transactions contemplated hereby and thereby, any Purchased Account, any Related Rights, any Collateral, any action taken or omitted by any of the Indemnitees, any actions to be performed by the Customer hereunder or otherwise, or in connection with any of the foregoing, any investigative, administrative or judicial proceedings, whether or not such

Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, the purchase of Accounts, the use or intended use of the proceeds of the payments made to the Customer….

****

Notwithstanding the foregoing, the Customer shall not be obligated to indemnify any Indemnitee for (A) any Indemnified Liability caused directly by the gross negligence or willful misconduct of such Indemnitee….

Ex. A, § 11.07.

247.    Wells Fargo is not entitled to indemnification under the Account Purchase Agreements or any other agreement for any legal or other expenses related to obligations owed to Wells Fargo by Cassera Entities, or for obligations owed by any of the Debtors to WFFL.

248.    Wells Fargo is not entitled to use the Wells Fargo Retained Cash Collateral for payment of legal fees or other expenses related to obligations owed to Wells Fargo by Cassera Entities, or for obligations owed by any of the Debtors to WFFL.

249.    To the extent any claims asserted in this adversary proceeding are claims for which Wells Fargo is entitled to indemnification under the Account Purchase Agreements or any other agreement, and such indemnification rights are secured by the Wells Fargo Retained Cash Collateral, Wells Fargo is not entitled to indemnification or use of the Wells Fargo Retained Cash Collateral because its costs and expenses were directly caused by its own gross negligence or willful misconduct.

250.    Moreover, to the extent the Trustee is the prevailing party, such indemnification provisions are not enforceable under applicable law.

251.    No other claims have been asserted or threatened against Wells Fargo for which it is entitled to indemnification under its agreements with the CRS Debtors.

WHEREFORE, Plaintiff, as chapter 11 trustee of the CRS Debtors, respectfully requests that the Court enter an Order directing the release and turnover of the Wells Fargo Retained Cash

Collateral, dissolving and releasing the Stipulation Reserve Account, and granting such other equitable relief as may be just and proper.

## COUNT XXIII

### Punitive Damages

252. Plaintiff restates and re-alleges paragraphs 1 through 98 of this Complaint as though fully set forth herein.

253. During the course of the Debtors' bankruptcy proceedings, Wells Fargo has acted egregiously and unlawfully, brazenly and intentionally charging the Debtors and their estates for hundreds of thousands of dollars of fees and expenses for which Wells Fargo knew it not entitled to reimbursement from the Debtors' estates.

254. Wells Fargo purposefully and with malevolent intent obfuscated and concealed its misconduct by (among other things) failing to provide support for its charges after they were discovered, claiming that its charges were "ordinary" and "customary" bank fees, and playing a "catch-me-if-you-can" game with the Trustee.

255. Wells Fargo took unfair advantage of the circumstances surrounding TSE's payroll tax non-payments by grossly overcharging the CRS Debtors for the costs of collecting Wells Fargo's loan, and improperly demanding the payment of onerous fees. Even after Wells Fargo's loans were paid in full, including all of claimed fees and costs, Wells Fargo withheld millions of dollars of the CRS Debtors' property in an effort to minimize the likelihood that its improper charges to the Debtors' estates would be discovered.

256. In sum and substance, Wells Fargo has shown a clear disregard and disrespect for the Bankruptcy Code and legal process, and its conduct amounts to a fraud upon the Court.

257. Meaningful punitive damages are necessary and appropriate to punish Wells Fargo for its egregious conduct and to deter future misconduct in bankruptcy cases.

WHEREFORE, Plaintiff, as chapter 11 trustee of the Debtors, respectfully requests that the Court enter judgment: (a) awarding to the Trustee all of his attorneys' fees and other expenses incurred investigating Wells Fargo's charges to the Debtors' accounts; (b) granting punitive damages in treble the amount of the damages awarded in Counts I-XXII of this Complaint; and (c) and granting such other equitable relief as may be just and proper.

Dated: New York, New York
      October 2, 2017

Respectfully submitted,

By: */s/    Vincent E. Lazar*

Vincent E. Lazar
Landon Raiford (*pro hac vice* motion pending)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Tel. (312) 222-9350
fax (312) 527-0484
vlazar@jenner.com
lraiford@jenner.com

Richard Levin
Carl N. Wedoff
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
Tel. (212) 891-1600
fax (212) 909-0815
rlevin@jenner.com
cwedoff@jenner.com

*Attorneys for Plaintiff James S. Feltman,*
*Chapter 11 Trustee*