**OTTERBOURG P.C.**
Richard G. Haddad
John Bougiamas
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Attorneys for Wells Fargo Bank, National Association and*
*Wells Fargo Financial Leasing, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>TS EMPLOYMENT, INC.<br><br>               Debtor. | Case No. 15-10243 (MG)<br><br>Chapter 11 |
| In re<br><br>CORPORATE RESOURCE SERVICES, INC., *et al.*,[1]<br><br>               Debtor. | Case No. 15-12329 (MG)<br><br>Chapter 11<br>(Jointly Administered) |
| JAMES S. FELTMAN, not individually but solely as chapter 11 trustee for TS Employment, Inc., Corporate Resource Services, Inc., *et al.*,<br><br>               Plaintiff,<br><br>      v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO FINANCIAL LEASING, INC.,<br><br>               Defendants. | Adv. Pro. Nos. 17-01175<br>               17-01176 |

## <u>DEFENDANTS' PRE-TRIAL BRIEF</u>

---

[1] The CRS Debtors in these jointly administered chapter 11 cases are: (1) Corporate Resource Services, Inc., (2) Accountabilities, Inc., (3) Insurance Overload Services, Inc., (4) Integrated Consulting Services, Inc., (5) Corporate Resource Development Inc., (6) The CRS Group, Inc., (7) Diamond Staffing Services, Inc., and (8) TS Staffing Services, Inc.

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ............................................................................................................7

    I.    THE APA FACILITY FEES ARE NOT
    CONSTRUCTIVE FRAUDULENT TRANSFERS ...............................................7

        A.    Applicable Law of Constructive Fraudulent Transfer .................................7

        B.    More Than Reasonably Equivalent Value
            Was Provided to CRS for the APA Facility Fees ......................................10

    II.    THE PAYROLL OVERDRAFT IS NOT A
    FRAUDULENT TRANSFER ..............................................................................14

    III.    THE POST-PETITION ACCOUNT CHARGES
    CANNOT BE RECOVERED UNDER ANY OF
    THE TRUSTEE'S THEORIES ...........................................................................17

        A.    The Post-Petition Charges Are Not Unauthorized Transfers.....................18

        B.    The Post-Petition Account Charges Were
            in Accordance with the Account Agreements ...........................................20

        C.    The Post-Petition Account Charges Are Neither
            Constructive Nor Actual Fraudulent Transfers.........................................22

        D.    The Trustee Cannot Recover the Post-Petition Account Charges
            Under Theories of Conversion or Unjust Enrichment ..............................22

        E.    Imposition of Punitive Damages Is Inappropriate ....................................24

    IV.    THE WFFL BUYOUT PAYMENT IS NEITHER
    A PREFERENCE NOR A FRAUDULENT CONVEYANCE ............................25

    V.    WELLS FARGO WAS CONTRACTUALLY PERMITTED
    TO BE REIMBURSED FOR THE LEGAL FEES ...............................................28

Cases

*ASARCO LLC v. American Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) ..................10

*Brown v. Brown*, 12 A.D.3d 176 (1st Dep't 2004) ......................................................23

*Caring Professionals, Inc. v. Catholic Health Care System d/b/a Archcare*,
   No. 656248/2016, 2017 WL 5725516 (Sup. Ct. N.Y. Co. Nov. 22, 2017) .............23

*Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43 (2006) ....................23

*Curtis Properties Corp. v. Greif Companies*, 236 A.D.2d 237 (1st Dep't 1997) .........23

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.*
   *(In re Adelphia Commc'ns Corp.)*, No. 02-41729 (REG), 2006 WL 687153
   (Bankr. S.D.N.Y. Mar. 6, 2006)..............................................................................9

*Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268 (1st Dep't 2003) ..................23

*Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (2012) ...........................................24

*Goldberg v. Such (In re Keplinger)*, 284 B.R. 344 (N.D.N.Y. 2002)...........................26

*Harrison v. N.J. Comm. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452
   (Bankr. S.D.N.Y. 2014) ...........................................................................................9

*In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837 (Bankr. C.D. Ill. 2005).......................8

*In re Lyondell Chemical Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017) ..........................7, 9

*In re NextWave Personal Commc'ns, Inc.*, 200 F.3d 43 (2d Cir. 1999) ........................8

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)............................................................10

*In re S.W. Bach & Co.*, 435 B.R. 866 (Bankr. S.D.N.Y. 2010).....................................7

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) .....................................................7

*In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371 (Bankr. S.D.N.Y. 2013).............9

*Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, 798 F.3d 983
   (10th Cir. 2015)......................................................................................................27

*KH Funding Co. v. Escobar (In re KH Funding Co.)*, 541 B.R. 308
   (Bankr. D. Md. 2015)..............................................................................................27

*Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003) ..................................................27

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30
    (2d Cir. 1996).................................................................................................................26

*Liq'n. Trust v. Daimler AG (In re Old CarCo LLC)*, 509 F. App'x. 77
    (2d Cir. 2013).............................................................................................................8, 10

*Matter of Clark*, 146 A.D.3d 495 (1st Dep't 2017) .....................................................24

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991) .................9, 10, 12, 15

*MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y 1995) ...........................................................................8

*Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370
    (Bankr. D. Mass. 1991)..............................................................................................9

*Peltz v. Hatten*, 279 B.R. 710 (Bankr. D. Del. 2002) ....................................................8

*Rocanova v. Equitable Life Assurance Society of the U.S.*, 83 N.Y.2d 603,
    612 N.Y.S.2d 339, 342, 634 N.E.2d 940 (1994)......................................................25

*Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981)....................................9

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000)....................................................21

*U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian
    Const. Corp.*, 95 F.3d 153 (2d Cir. 1996) ...............................................................24

*Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961)..........................25

Statutes, Codes and Rules

11 U.S.C. § 544...................................................................................................................7, 17

11 U.S.C. § 547.................................................................................................................25, 26

11 U.S.C. § 548.............................................................................................................7, 8, 17

11 U.S.C. § 549.........................................................................................................5, 17, 18

N.Y. Debtor and Creditor Law § 273 ...............................................................................7, 17

N.Y. Debtor and Creditor Law § 274 ...............................................................................8, 17

N.Y. Debtor and Creditor Law § 275 ...............................................................................7, 17

N.Y. Debtor and Creditor Law § 276 .................................................................................17

N.Y. Debtor and Creditor Law § 278 ...........................................................................17

N.Y. Debtor and Creditor Law § 279 ...........................................................................17

Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Financial Leasing, Inc. ("Wells Fargo Financial Leasing," and together with Wells Fargo Bank, "Wells Fargo" or "Defendants") by its undersigned counsel, Otterbourg P.C., respectfully submit this Pre-Trial Brief addressing the main legal issues to be tried in the adversary proceedings commenced by Plaintiff James S. Feltman, as chapter 11 trustee ("Trustee" or "Plaintiff") for the CRS Debtors and TS Employment, Inc. ("TSE" and together with the CRS Debtors, the "Debtors").

## PRELIMINARY STATEMENT

These adversary proceedings are nothing more than an attempt by the Chapter 11 Trustee to extract a payment from Wells Fargo – the senior secured creditor of the CRS Debtors and innocent party to benefit the Trustee and his professionals. The Debtors, in whose shoes this Trustee stands, were in the business of providing temporary employee staffing. TSE was the PEO[2] for the CRS Debtors. By failing to remit withholding taxes, TSE committed a staggering tax fraud aggregating some $113 million. Wells Fargo was the biggest creditor of CRS at the time the fraud was discovered and faced substantial risk if there was an immediate liquidation – and substantial risk if adequate controls were not put in place.

Despite the discovery of this massive fraud in January 2015, Wells Fargo continually worked with CRS and TSE to provide the requested funding so that the businesses were wound down in an orderly fashion, including by continuing to advance funds to the Debtors as necessary for the payment, for example, of 30,000 TSE employees. When it was all said and done, Wells Fargo advanced over $1 billion to the CRS Debtors over the last year of this loan facility,

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to them in the Joint Pretrial Order dated November 8, 2018 [ECF No. 22].

including continuing to advance after discovery of the fraud for wind-down expenses, including payroll, taxes, benefits and the like. The Trustee cannot deny the benefits and value that Wells Fargo has furnished to the Debtors. Instead, the Trustee complains about the contractually agreed upon fees and expenses charged by Wells Fargo into the APA Facility and seeks to recover at least $7.2 million in transfers that the Trustee alleges may be avoided and recovered under the Bankruptcy Code and applicable state law as follows:

**The APA Facility Fees**: The Trustee seeks to recover $4.1 million in fees charged to CRS under the APA Facility for various loan amendments, extensions beyond the maturity date, monitoring fees and facility fees as fraudulent transfers as to CRS under Sections 544 and 548 of Title 11, United States Code (the "Bankruptcy Code") and N.Y. Debtor and Creditor Law ("DCL"), Sections 273-275, 278 and 279. The APA Facility Fees were contractually agreed upon pursuant to (i) the Eleventh Amendment, entered into in June 2014, that extended the APA Facility for one year during a crucial period for CRS when it had severe liquidity constraints and limited alternative financing options; and (ii) the February 4, 2015 Amendment, an amendment entered into by the parties following the discovery of the tax fraud at TSE and TSE's bankruptcy filing. CRS received reasonably equivalent value for the fees, and the amount is eminently reasonable under the circumstances, and less expensive than any alternative.

The fees were calculated to compensate Wells Fargo for the additional risk and internal costs associated with continuing to make advances to CRS. In nine months, these fees totaled $4.1 million or an average of $455,000 per month. In return, CRS received new high risk advances of over $1 billion. The fees, as a percentage of the new high risk advances, were 0.40% (less than 1%). Of those advances, $106 million of new advances were made to facilitate the wind down of CRS after TSE filed bankruptcy as a result of the tax fraud.

Moreover, as compared to market, Wells Fargo's fee structure was substantially lower. Before the tax fraud was discovered, CRS had five proposal letters from various potential take out lenders. Three of the proposals were for lines of credit, the fourth was for a term loan and the fifth was for a line of credit and term loan. In comparing the annual fee structure to Wells Fargo, the average of the potential take-out lender fees was almost $1.8 million higher per year than Wells Fargo's most recent annualized fees. If the proposed term loans were added, the potential take-out fees would be $7.9 million higher. Accordingly, CRS received more than reasonable value in exchange for the APA Facility Fees.

**The Payroll Overdraft**: The Trustee seeks to recover $2.5 million for overdrafts (the "Payroll Overdraft") incurred in TSE's bank accounts as fraudulent transfers as to CRS under Sections 544 and 548 of the Bankruptcy Code and N.Y. DCL Sections 273-275, 278 and 279. The Payroll Overdraft was incurred in connection with Wells Fargo's honoring of payroll checks for 9,117 TSE employees the weekend prior to TSE's bankruptcy filing even though an agreement between Wells Fargo and CRS for the Debtors' wind-down plans, including CRS's express agreement to cover TSE's payroll expenses, was signed after close of business on Friday, January 30, 2015. The Trustee's position that the Payroll Overdraft can be recovered as a fraudulent conveyance ignores the reality of what occurred – an advance by Wells Fargo to CRS to be used to fund payroll at TSE for CRS' benefit. The money was used to pay a CRS liability – its guarantee of overdrafts that originated in the TSE ZBA Accounts. The payment created value to CRS because it allowed (a) accounts receivable to be created; (b) preserved the value of CRS' accounts receivable; and (c) satisfied CRS' guaranty obligation to Wells Fargo. Therefore, the Payroll Overdraft cannot be a fraudulent conveyance for a number of reasons:

(a) <u>First</u>, payment of the Payroll Overdraft was approved by the Court – on

3

the application of TSE itself in the Wages Motion.  As set forth in the Wages Motion itself, "payment of the Employees' pre-petition wages is <u>essential</u> to maintain the Debtor's and CRS's relationship with its Employees."  Wages Motion at ¶ 3, emphasis added.  The only way for the employees to be paid was for Wells Fargo to authorize and advance money to CRS which would then transfer the money to the Master Payroll Funding Account to pay the employees.

(b)     <u>Second</u>, the Payroll Overdraft was also expressly agreed upon under the January 30, 2015 Indemnification Agreement pursuant to which CRS authorized and directed Wells Fargo to honor and/or fund any overdrafts or negative balances arising in any of the TSE ZBA Accounts.  Had CRS not agreed to sign the Indemnification Agreement, Wells Fargo could have returned the payroll checks by the Monday morning of TSE's bankruptcy filing (the internal deadline to return checks), and the workers would not have been paid.

(c)     <u>Third</u>, the overdraft liability arose as a result of the overdrafts in the TSE ZBA Accounts.  While the overdrafts were swept into and aggregated for bookkeeping purposes only in the Master Payroll Funding Account, the overdrafts originated and were charged to the TSE ZBA Accounts and remained liabilities of TSE.

(d)     <u>Fourth</u>, the Payroll Overdraft was part of a $9 million advance made by Wells Fargo, in consultation and with the approval of the TSE and CRS CROs, to allow CRS to pay, among other expenses, two weeks of payroll for TSE's employees who were exclusively servicing customers of CRS as well as the $2.5 million Payroll Overdraft.  Had Wells Fargo not honored those payroll checks before the Court approved the advances on February 4, 2015, the 9,117 employees exclusively servicing CRS' customers would have not been paid and would have likely quit, resulting in massive offsets and counterclaims by CRS customers against amounts payable to CRS.  Moreover, the remainder of the 30,000 employees – employees that

CRS relied upon to fulfill its contractual obligations with its customers - would have left soon thereafter. Consequently, CRS would have been placed out of business immediately resulting in catastrophic consequences to all creditors and stakeholders.

(e)     _Fifth_, there also can be no fraudulent conveyance because CRS received value for the transfer – satisfaction of its guaranty obligations and the funding to continue in business. In fact, CRS received more value from the new receivables generated ($15.6 million) than it paid for the Payroll Overdraft.

**The Post-Petition Account Charges**:   The Trustee seeks to recover $389,034.96 in account charges (the "Post-Petition Account Charges") as unauthorized post-petition transfers under Section 549 of the Bankruptcy Code; fraudulent transfers as to CRS under Sections 544 and 548 of the Bankruptcy Code and N.Y. DCL Sections 273-276, 278 and 279; and under state law breach of contract, conversion and unjust enrichment theories. In addition, the Trustee seeks punitive damages against Wells Fargo for these charges. The Post-Petition Account Charges were contractually agreed upon and stipulated account charges incurred following the TSE bankruptcy case in connection with the treasury management services Wells Fargo furnished to TSE and the Cassera-affiliated entities and cannot be recovered under any of the Trustee's theories:

(a)     The charges were expressly in accordance with the APA Facility, the relevant account agreements and also authorized by the TSE Stipulation and the Second TSE Stipulation, as well as the orders of the Court; all of which recognized the payment to Wells Fargo of charges related to TSE's accounts. Moreover, Wells Fargo's advance to CRS to pay each of these fees was authorized by the CRS CRO. As a result, such charges were not unauthorized post-petition transfers under Section 549 of the Bankruptcy Code.

(b)	CRS also received value for these charges because CRS and TSE continued to require the use of Wells Fargo's treasury management services to continue administering payroll for CRS and its customers and these charges were part of the cost of business to continue such arrangement.

(c)	Moreover, Wells Fargo did not convert CRS' property and was not unjustly enriched by these transfers each of which were in accordance with the agreements between the parties – so there can be no conversion or quasi-contractual claim as a matter of law.

(d)	Finally, no basis exists to impose punitive damages against Wells Fargo for these charges which were all assessed and paid to Wells Fargo in accordance with the full knowledge of the CRS CRO and the Trustee, and in accordance with the APA Facility, account agreements and the two TSE Stipulations entered as orders of this Court.

**The WFFL Lease Buyout Payment**:  The Trustee seeks to recover payment of $240,220.26 made by CRS to pay off 17 copier leases.  The Trustee seeks to recover the WFFL Lease Buyout Payment as an alleged preferential payment even though this payment was fully secured because Wells Fargo's security interest extended to financial accommodations extended by its affiliates, including WFFL, a subsidiary of Wells Fargo.  Moreover, the payment was in accordance with the agreements between the parties and thus an ordinary course transaction.  In the alternative, the Trustee seeks recovery of the payment as a fraudulent conveyance to the extent CRS was not counterparty to a particular copier lease and therefore the payment could not have been on account of an antecedent debt.  The WFFL Lease Buyout Payments cannot be recovered as a fraudulent conveyance because CRS received value for the payment -- the copiers -- which were sold as part of the sale of CRS's businesses.

**The Legal Fees**:  The Trustee seeks to recover an unspecified amount of legal fees paid

by Wells Fargo on grounds that (a) the CRS' agreements with Wells Fargo did not permit Wells Fargo to recover legal expenses relating to matters involving the Cassera-affiliated entities or WFFL, or (b) legal expenses related to claims for which the Trustee prevails in this litigation. Contrary to the Trustee's allegations, the fees were paid pursuant to the Debtors' indemnification obligations and orders of this Court, including the two TSE Stipulations. All bills were provided to the Trustee, and no objections were ever received.

*     *     *

In sum, Wells Fargo will demonstrate at trial that none of the claims has any merit.

ARGUMENT

## I.     THE APA FACILITY FEES ARE NOT CONSTRUCTIVE FRAUDULENT TRANSFERS

### A.  Applicable Law of Constructive Fraudulent Transfer

The Trustee argues that the APA Facility Fees constitute constructive fraudulent conveyances under Sections 544 and 548 of the Bankruptcy Code and Sections 273-275 of the DCL. Specifically, Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer of an interest of the debtor in property may be avoided if: (i) the debtor did not receive "reasonably equivalent value" in exchange for the transfer, and (ii) the debtor can satisfy at least one of the relevant financial condition tests under section 548(a)(1)(B). 11 U.S.C. § 548(a)(1)(B). Similarly, under DCL § 273, "a transfer made without fair consideration" is a constructive fraud "regardless of the intent of the transferor." *In re Sharp Int'l Corp.,* 403 F.3d 43, 53 (2d Cir. 2005). The burden is on the movant to demonstrate the elements of a constructive fraudulent transfer claim by a preponderance of the evidence. *In re Lyondell Chemical Co.*, 567 B.R. 55, 108 (Bankr. S.D.N.Y. 2017), *citing*, *In re S.W. Bach & Co.*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010).

Here, the parties do not dispute the first element of the claim that these payments were "transfers of an interest of the debtor in property." In addition, the parties have stipulated solely for the purposes of these Adversary Proceedings to one of the financial tests set forth in both the Bankruptcy Code and the DCL - that the debtor "was engaged in business or a transaction, or was about to engage in business or transaction, for which any property remaining with the debtor was unreasonably small capital." *See* 11 U.S.C. § 548(a)(B)(ii)(II), DCL § 274.

However, the Trustee must also prove (and he cannot) that the debtor "received less than a reasonably equivalent value in exchange for [the] transfer." 11 U.S.C. § 548(a)(1)(B)(i); *In re NextWave Personal Commc'ns, Inc.,* 200 F.3d 43, 56 (2d Cir. 1999) ("Under the avoidance provisions of the [Bankruptcy] Code, a transfer or obligation is or is deemed to be a fraudulent conveyance—and therefore avoidable—if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation.")

This is a question of fact that must be evaluated as of the time of the transfer. *See Liq'n. Trust v. Daimler AG (In re Old CarCo LLC)*, 509 F. App'x. 77, 78 (2d Cir. 2013). "Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors." *In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837, 845 (Bankr. C.D. Ill. 2005); *see also Peltz v. Hatten*, 279 B.R. 710, 738 (Bankr. D. Del. 2002) ("When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."); *MFS/Sun Life Trust– High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 937 (S.D.N.Y 1995) ("[T]he question of reasonably equivalent value is determined by the value of the consideration

exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged.")

A finding that there was reasonably equivalent value does not require that the consideration exchanged be mathematically equal. A court should consider both direct and indirect benefits flowing to the debtor as a result of the exchange in determining if there was reasonably equivalent value. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646–47 (3d Cir. 1991); *Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 991–92 (2d Cir. 1981).

In determining whether a debtor has received reasonably equivalent value in a transfer, courts undertake a two-step inquiry: first, a court must determine "whether the debtor received any value at all in exchange for the transfer; *i.e.* any realizable commercial value as a result of the transaction," and second, a court must determine "whether that value was in fact reasonably equivalent ...." *In re Lyondell Chemical Co.*, 567 B.R. at 113-14, *quoting Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02-41729 (REG), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006).

As this Court has held "generally speaking, 'fair equivalence only requires that the value of the consideration be reasonably equivalent rather than exactly equivalent in value to the property transferred or obligation assumed.'" *Id.*, *quoting*, *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 393 (Bankr. D. Mass. 1991); *Harrison v. N.J. Comm. Bank (In re Jesup & Lamont, Inc.*), 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014) ("A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration. However, the benefits the debtor receives from the transfer must approximate its expected costs."). *See also In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013) (the value received by a debtor need not be exactly equivalent, but may be "roughly the value of the

transfer made.”); *ASARCO LLC v. American Mining Corp.*, 396 B.R. 278, 364 (S.D. Tex. 2008) (debtor received reasonably equivalent value where it received 85% to 90% of value of stock, noting that “the law does not demand that [the debtor] receive an amount equal to the fair market value of the asset it transfers; the consideration must only be reasonably equivalent”).

### B. More Than Reasonably Equivalent Value Was Provided to CRS for the APA Facility Fees

It is well established that “[t]he ability to borrow money has considerable value in the commercial world.” *In re Old CarCo LLC*, 509 F. App’x at 79 *quoting Mellon Bank,* 945 F.2d at 647.  Quantification of the value providing by the ability to borrow “depends upon the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business.”  *In re Old CarCo LLC*, 2011 WL 5865193 *12 (S.D.N.Y. 2011) *citing Mellon Bank*, 945 F.2d at 647.  Therefore, the value provided by loans must be considered in any analysis of whether a debtor received reasonably equivalent value in a challenged transaction.  *Id.*  Such value need not be direct, tangible, or easily quantifiable in order to be considered part of the fair consideration received by a debtor. *Id. citing In re R.M.L., Inc.,* 92 F.3d 139, 151 (3d Cir. 1996).

Here, “reasonably equivalent value” was provided to CRS for the APA Facility Fees. Following Wells Fargo’s discovery of severe liquidity constraints at CRS by June 2014 and the expiration of the financing arrangements, Wells Fargo did not stop lending.  Rather, in exchange for continuing to advance substantial money into such a risky environment, Wells Fargo initiated closer monitoring of its collateral position and CRS’ cash flows.  In return, CRS received new high risk advances of over $1 billion.  In exchange for such advances, the fees that Wells Fargo charged, as a percentage of the new high risk advances, were 0.40% (less than 1%) and much less expensive than the other financing options available to CRS at that time.  Moreover, of those

advances, $106 million new advances were made to facilitate the wind down of CRS after TSE filed bankruptcy as a result of the tax fraud – all of which paid the workers and stabilized the businesses to preserve value.

The APA Facility Fees were also more than reasonable in view of the additional risk and internal costs incurred by Wells Fargo for the extension and indeed were less than the fees that CRS would incur under the other proposed financing offers received by CRS.  As compared to market of available credit to CRS, prior to discovery of the tax fraud, Wells Fargo's fee structure was substantially lower.  Before the tax fraud was discovered, CRS had five proposal letters from various potential take out lenders.  Three of the proposals were for lines of credit, the fourth was for a term loan and the fifth was for a line of credit and term loan.  In comparing the annual fee structure to Wells Fargo, the average of the potential take-out lender fees was almost $1.8 million higher per year than Wells Fargo's most recent annualized fees.  If the proposed term loans were added, the potential take-out fees would be $7.9 million higher.

The Trustee contends that the CRS Debtors did not receive "reasonably equivalent value" for the APA Facility Fees contending that the extension of the APA Facility pursuant to the contractually agreed upon amendments was "illusory" because the APA Facility was terminable on 30 days' notice, and that the amendments included new covenants and financial conditions that would put the CRS Debtors in default.  Moreover, the Trustee argues that Wells Fargo did not extend any "new" credit to the CRS Debtors because of the revolving nature of the APA Facility and due to Wells Fargo's increase in the block on account availability.  Finally, the Trustee argues that Wells Fargo charged unnecessary fees to the CRS Debtors for a liquidation that benefited only itself.  The Trustee is wrong on all counts.

These advances did not just benefit Wells Fargo as the Trustee alleges.  Rather, the

advances allowed for the borrowers to carry out their business plan and operations first in the ordinary course, and then for an orderly liquidation process run by the Debtors to ensure that that thousands of employees and other creditors of the CRS Debtors could maximize their recoveries. The ability to continue borrowing while CRS undertook its liquidation is precisely the type of value that should be considered in analyzing whether there was "reasonably equivalent value" for the APA Facility Fees. *Mellon Bank*, 945 F.2d at 648 ("the value provided by loans must be considered in any analysis of whether a debtor received reasonably equivalent value.")

Indeed, the Eleventh Amendment extended the term of the APA Facility for one more year. The inclusion of a 30-day termination notice period and financial covenants - normal terms in a discretionary account purchase agreement – did not result in an "illusory" extension of credit. First, whether the extension of credit was "illusory" is contradicted by the fact that following the Eleventh Amendment and continuing through these bankruptcy cases, Wells Fargo extended over $1 billion of credit through the APA Facility. Second, contrary to the baseless allegation of the Trustee, such provisions were not designed to trigger a default (and in fact did not trigger a default) but rather were used as an alert mechanism. If triggered, the covenants would give CRS and Wells Fargo an early warning signal of an impending liquidity issue. This would give CRS time to adjust its cost structure and Wells Fargo time to determine a different loan structure to accommodate CRS.

Moreover, the agreed availability block in the Eleventh Amendment also did not render Wells Fargo's extension of credit as "illusory". The availability block was phased in and gradually increased over several months to allow CRS time to adjust its cost structure and plan its cash flow. The availability block was used to assure CRS and Wells Fargo that there would be adequate funds available in the event of an unanticipated liquidity shortfall were the block

(reserve) could be used to fund critical expenses such as payroll. The availability block would give CRS time to resolve the issue or make adjustments to its cost structure without causing a disruption of its business. Indeed, the availability block allowed CRS the liquidity it required to transition through its bankruptcy. The availability block also did not decrease Wells Fargo's exposure and contrary to the Trustee's contention, Wells Fargo's exposure increased by $7 million based on average total exposure of $62 million 2013 compared to $69 million in 2014.

Finally, contrary to the Trustee's contention, Wells Fargo did not force CRS to liquidate. After the tax fraud was uncovered, it was CRS's financial advisor, Carl Marx and CRS's management that proposed an orderly liquidation. The facts and circumstances dictated no better alternative. As the best alternative for all parties, Wells Fargo agreed to finance an orderly liquidation provided that CRS and TSE retain independent third party CROs to provide Wells Fargo with reliable reporting and information.

Under the wind down plan agreed to by all the parties, the accounts receivable collateral would be maximized and over 30,000 temporary employees would retain their jobs through an orderly transition to replacement staffing companies. Further, the maximization of the realization of the accounts receivable collateral would not only pay Wells Fargo off, but also provide a better recovery for the other creditors. If Wells Fargo had not agreed to continue financing CRS between the time of entry into the Eleventh Amendment, June 2014 and through these bankruptcy cases, CRS would have faced an immediate liquidation. As demonstrated by CRS' own efforts, alternative financing during this period was either unavailable or more expensive than the financing under the APA Facility. Certainly, following discovery of the tax fraud, obtaining alternative financing at any price would have been virtually impossible. Due, however, to Wells Fargo's desire to work with CRS and to continue to preserve CRS' enterprise

value, Wells Fargo made new advances of over $1 billion at its risk during this period.

As a result of Wells Fargo's advances to fund CRS's wind down plan, the realization of the receivable collections exceeded a 98% success rate and preserved over 30,000 jobs. Indeed, as a result of Wells Fargo's continued financing of CRS following the discovery of the fraud at TSE, the estate recovered $20 million from collections over and above the amounts owed to Wells Fargo.

Therefore, the Trustee's contention that "$15 million" of unnecessary expenses were incurred under APA Facility between 2014 and 2015 is not true, particularly since CRS would have paid more in interest and fees to any other the potential replacement lender and in any case, the Trustee is only seeking $4.1 million. Moreover, a portion of the $15 million was incurred in connection with the retention of professionals to perform the tasks of the former Tri-State employees that previously handled collections on CRS' behalf. Finally, the Debtors were of course free to obtain financing from any other source, but knew from their prior experience with Carl Marx, including the proposals that CRS received from other lenders, that any source would be far more expensive than the terms provided by Wells Fargo -- thus, the Wells Fargo financing provided value.

## II.   THE PAYROLL OVERDRAFT IS NOT A FRAUDULENT TRANSFER

The Trustee seeks to recover the $2.5 million Payroll Overdraft as a fraudulent transfer as to CRS. The Payroll Overdraft represents payment to reimburse Wells Fargo for the overdraft it carried in TSE's account prior to TSE's bankruptcy filing on February 2, 2015. Wells Fargo agreed to carry the overdraft and honor over 9,117 payroll checks even though a signed agreement between Wells Fargo and CRS for the Debtors' wind-down plans, including agreement to cover TSE's payroll expenses, was not executed until after business hours on

Friday, January 30, 2015.

CRS received "reasonably equivalent value" for the Payroll Overdraft and therefore the Payroll Overdraft cannot be a constructive fraudulent conveyance. As set forth in Point I.A., *supra*, in evaluating reasonably equivalent value, a court should consider both direct and indirect benefits flowing to the debtor, including any realizable commercial value as a result of the transaction. *Mellon Bank,* 945 F.2d at 646-47.

Here, the Payroll Overdraft created both direct and indirect value to CRS because the Payroll Overdraft (a) was used to pay CRS's guaranty obligation to Wells Fargo; (b) preserved the value of CRS's accounts receivable as a result of payment of TSE's employees; and (c) created new accounts receivable that arose from the funding.

Following the discovery of the payroll tax fraud at TSE, on Friday, January 30, 2015, TSE agreed that it would file a petition for Chapter 11 relief on Monday, February 2, 2015. In addition, both TSE and CRS agreed to appoint CROs to manage their wind downs and entered into discussions with Wells Fargo to provide funding to CRS for the orderly liquidation, including providing funding to CRS to pay the TSE employees.

The agreements between Wells Fargo and the TSE and CRS CROs to effectuate the orderly wind down of both TSE and CRS, including the funding of payroll, however, were not in place until after the Federal Reserve wire deadline that Friday night. As a result, loan advances by Wells Fargo to CRS under the APA Facility could not be made. Since loan advances could not be made that evening, in view of the massive tax fraud at TSE that was discovered earlier that week, it was not clear whether the funds CRS paid to TSE for payroll expenses would be used for the intended purposes as such funds might have been used for other purposes as had previously occurred.

Wells Fargo and CRS therefore entered into the Indemnification Agreement pursuant to which CRS agreed to be held responsible for overdrafts in the TSE ZBA Accounts that would be incurred over that weekend from the presentment of the 9,117 TSE employee payroll checks. Pursuant to the Indemnification Agreement, CRS provided an indemnity on the TSE ZBA Accounts to allow Wells Fargo to honor and/or fund any overdrafts arising in the TSE ZBA Accounts through the weekend and until the following week when the Wage Order was approved by the Bankruptcy Court in TSE's bankruptcy case. Through Wells Fargo's show of good faith and decision to honor the payroll checks that weekend by carrying an overdraft, CRS was able to continue operations and cover the payrolls of over 30,000 TSE employees.

On the TSE Petition Date, this Court held a hearing to consider the Wages Motion. The Wages Motion sought, among other things, that "Wells Fargo permits CRS to make payment of current pre-petition Employee Obligations to [TSE] in order to allow [TSE] to pay the Employee Obligations due on January 30, 2015…" As set forth in the Wages Motion, "payment of the Employees' pre-petition wages is *essential* to maintain the Debtor's and CRS's relationship with its Employees." Wages Motion at ¶ 3, emphasis added. The Bankruptcy Court approved the Wages Motion and entered the Wage Order pursuant to which Wells Fargo made a $9 million advance, which included the advance for the $2.5 overdraft payment to CRS, to pay, among other expenses, two weeks of payroll of employees of Debtor TSE who were exclusively servicing customers of CRS. The $9 million advance included a request for payment of $2.5 million that was clearly described as an overdraft due to the $9 million payroll checks that were covered the weekend before the TSE bankruptcy filing and approved by both the TSE and CRS CROs.

Unquestionably the arrangement benefitted CRS and provided value to CRS. The $9

million advance permitted CRS to advance funds to TSE to, among other things, fund TSE's payroll for two weeks, including honoring the payroll checks of the 9,117 employees over the weekend of January 30, 2015. Had Wells Fargo not honored those payroll checks over that weekend and before the Court approved the advances on February 4, 2015, the 9,117 employees exclusively servicing CRS' customers would have not been paid would have likely quit, resulting in massive offsets and counterclaims by CRS customers against amounts payable to CRS.

Moreover, the remainder of the 30,000 employees – employees that CRS relied upon to fulfill its contractual obligations with its customers – would have left soon thereafter. Consequently, CRS would have been out of business immediately, resulting in catastrophic consequences to all creditors and stakeholders. To avoid such a calamity and maximize the recovery to all creditors and stakeholders, Wells Fargo agreed to clear the checks provided Wells Fargo was reimbursed – which happened and was approved by the Court.

In addition to payment of the employees, as a result of the $9 million advance, CRS received $15.6 million of new equivalent value from the invoices (sales) generated by the advance. Accordingly, for the foregoing reasons, CRS received reasonably equivalent value for the Payroll Overdraft which cannot be recovered as a constructive fraudulent transfer.

## III.   THE POST-PETITION ACCOUNT CHARGES CANNOT BE RECOVERED UNDER ANY OF THE TRUSTEE'S THEORIES

As stated, the Trustee seeks to recover the Post-Petition Account Charges as unauthorized post-petition transfers under Section 549 of the Bankruptcy Code, fraudulent transfers as to CRS under Sections 544 and 548 of the Bankruptcy Code and N.Y. DCL Sections 273-276, 278 and 279 and under state law breach of contract, conversion and unjust enrichment theories. In addition, the Trustee seeks punitive damages against Wells Fargo for these charges. The Trustee cannot recover these charges under any of his theories and there is no basis for imposition of

punitive damages against Wells Fargo for collecting fees pursuant to an agreed stipulation and order of this Court.

### A.  The Post-Petition Charges Are Not Unauthorized Transfers

Section 549 of the Bankruptcy Code provides that "the trustee may avoid a transfer of property of the estate— (1) that occurs after the commencement of the case; and (2) … that is not authorized under this title or by the court."  11 U.S.C. § 549.  Here, the Post-Petition Charges were authorized by both the TSE Stipulation and the Second TSE Stipulation, each of which recognized the payment to Wells Fargo of charges related to TSE's accounts as well as the Wage Order and cash management order entered by the Court.  Moreover, Wells Fargo's advance to CRS to pay each of these fees was authorized by the CRS CRO.  As a result, such charges were not unauthorized post-petition transfers.

Specifically, after his appointment as TSE Trustee, the Trustee requested that Wells Fargo agree to fund the necessary costs of administering the TSE estate, including payment of payroll, and the Trustee's investigation and opened discussion on the terms and conditions of such funding.  On April 15, 2015, the Bankruptcy Court approved the TSE Stipulation.  Pursuant to the TSE Stipulation, Wells Fargo permitted the use of its cash collateral to administer TSE's estates, including conducting an investigation into the affairs of TSE.  In connection with the TSE Stipulation, Wells Fargo made an advance of $1 million.

Further, since the Trustee would continue to require Wells Fargo's treasury management services for the processing of payrolls, the TSE Stipulation also provided for the payment of overdrafts in the Wells Fargo's accounts maintained by TSE.

Pursuant to the TSE Agreement, Wells Fargo advanced nearly $7.9 million in funds that were deposited into the Santander Account for the purposes of payment of payroll-related

expenses. Of the $7.9 million, only $6.7 million was used by TSE to pay the payroll-related expenses for which they were intended. As a result, Wells Fargo demanded that the Trustee return the Surplus to CRS or Wells Fargo. The Trustee refused and took the position that he could instead use the Surplus funds to satisfy general obligations of the Estate.

As a result of the dispute, on May 13, 2015, the CRS Debtors and Wells Fargo filed the Joint Application, seeking, among other things, return of the Surplus. In addition, as one of the alternatives to return of the Surplus to CRS, CRS and Wells Fargo requested that the Surplus be used to satisfy TSE's liability to Wells Fargo arising from overdrafts and future overdrafts resulting from checks that had been issued but not yet drawn on the TSE ZBA Accounts. At the time of the filing of the Joint Application, those overdrafts were estimated to be $672,314.09.

Shortly after the filing of the Joint Application, Wells Fargo, CRS and the TSE Trustee entered into negotiations to enter into a Stipulation to resolve the Joint Application. As part of the negotiation of the Joint Application, the TSE CRO reviewed the TSE ZBA Accounts, reconciled the charges in detail and furnished to the Parties the fees that were owed to Wells Fargo. As of the date that the Stipulation resolving the Joint Application was finalized, June 25, 2015, CRS represented, and Wells Fargo agreed, that the current balance (*i.e.*, amount due) was in the amount of the June 25 Overdraft Balance, -825,785.11. Both the Trustee and his counsel vetted the June 25 Overdraft Balance, neither objected to the amount, and the Trustee's counsel personally inserted the amount into the Stipulation. On June 25, 2015, the Bankruptcy Court approved the Second TSE Stipulation. The Second TSE Stipulation, among other things, provided that a portion of certain funds held on deposit in the Santander Account would be returned to Wells Fargo to satisfy the June 25 Overdraft Balance.

Despite reaching agreement on the payment of the June 25 Overdraft Balance, the

Trustee now seeks to recover the post-petition bank account charges of $389,034.96, representing a portion of the June 25 Overdraft Balance, asserting that it related only to Tri-State. The Trustee ignores (a) this was a negotiated number, (b) vetted by his professionals, (c) included in an order, and (d) representing a compromise of several disputes. The fees were all standard fees in effect at the time that they were incurred and authorized transfers.

Separately, the Trustee's contention that Wells Fargo improperly charged TSE for $74,415 in post-petition overdraft charges (apparently included in the $364,048) is wrong. The way the Trustee and his professionals maintained the TSE ZBA Accounts was that when checks were presented and debited to one of the five TSE ZBA Accounts, the Trustee and his professionals first validated that the checks were legitimate before CRS made a draw request to cover the payment. Because this process, as implemented by the Trustee and his professionals, often took longer than the same day to complete, an overnight overdraft was often created, resulting in charges. These charges were expressly called for and approved by both the TSE Stipulation and the Wage Order.

Finally, included within the charges sought to be recovered by the Trustee is approximately $56,000 from a $100,000 July 1, 2015 charge in the TSE 2002 Account. The charge was paid by CRS in accordance with the Second TSE Stipulation as a reserve for the final fees and payroll obligations on the TSE bank accounts that were in the process of being closed.

### B. The Post-Petition Account Charges Were In Accordance with the Account Agreements

The Trustee also contends that that Post-Petition Account Charges were not authorized under TSE's agreements with Wells Fargo because they were assessed against the TSE 2002 Account, an account the Trustee contends that he did not authorize be opened. As a result, the Trustee contends that the charges are a breach of the account agreements because TSE and Wells

Fargo.  The Trustee is in error and there is no breach of the account agreements.

To prevail on a claim for breach of contract under New York law, a plaintiff must prove "a contract; performance of the contract by one party; breach by the other party; and damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000).  Here, there is no breach because the Post-Petition Account Charges were all incurred the accounts between Wells Fargo, TSE or the Cassera-affiliated entities and in accordance with the Commercial Account Agreement in effect for each such account.  The Post-Petition Account Charges were summarized for billing purposes only in the TSE 2002 Account and were paid by CRS in accordance with both the TSE Stipulations and the practices established by these parties prior to the bankruptcy case.

Specifically, upon TSE's bankruptcy filing, the TSE CRO requested that Wells Fargo open three DIP Account.  The process to open the TSE 2002 Account began with the assignment of account numbers.  Although the TSE CRO ultimately decided that the TSE 2002 accounts were not needed since this Court entered an Order on February 4, 2015 authorizing TSE to use its existing accounts, Wells Fargo determined that the Master Payroll Funding Account should be closed because Wells Fargo was in the process of closing the Cassera-affiliated entity accounts and needed to separate the TSE accounts so they could be used to fund payrolls during TSE's bankruptcy.

Since the TSE CRO did not need the Master Billing Account for operating or payroll purposes but did need a new account to replace the Master Payroll Funding Account solely for purposes of aggregating and summarizing fees, the TSE 2002 Account was designated as the new master billing account.  As a the new master billing account, the Master Billing Account served as the "Key Billing" account for the bank fees and summarized and detailed the fees.

Thus, the Post-Petition Account Charges, while incurred in the separate accounts, were summarized and billed from the Master Billing Account. Those separate accounts each were subject to the Wells Fargo's Commercial Account Agreement in place at the time the accounts were opened. The Post-Petition Account Charges were standard fees incurred in those accounts and were aggregated and summarized in the TSE 2002 Account.

### C. The Post-Petition Account Charges Are Neither Constructive Nor Actual Fraudulent Transfers

The Post-Petition Account Charges also cannot be recovered as constructive or actual fraudulent conveyances. Indeed, the Post-Petition Account Charges were contractually agreed upon and stipulated account charges incurred following the TSE bankruptcy case in connection with the treasury management services Wells Fargo furnished to TSE and the Cassera-affiliated entities and cannot be recovered. Moreover, Wells Fargo's advance to CRS to pay each of these fees was authorized by the CRS CRO.

Further, CRS received value for these charges because CRS and TSE continued to require the use of Wells Fargo's treasury management services to continue administering payroll for CRS and its customers and these charges were part of the cost of business to continue such arrangement. It is for this reason as well that the charges are also not actual fraudulent conveyances because they did not "hinder, delay or defraud" CRS's creditors who benefited from Wells Fargo's continuing cooperation in these cases.

### D. The Trustee Cannot Recover the Post-Petition Account Charges Under Theories of Conversion or Unjust Enrichment

The Trustee also makes claims to recover the Post-Petition Account Charges on grounds of conversion and unjust enrichment. The Trustee's claims on such grounds fail as a matter of law since the Post-Petition Account Charges were in accordance with the agreements between

the parties.  It is well established that an enforceable written contract precludes recovery in quasi contract with respect to events arising from the same subject matter.  *Curtis Properties Corp. v. Greif Companies*, 236 A.D.2d 237, 239 (1st Dep't 1997).

Thus, under New York law, "[a] cause of action for conversion cannot be predicated on a mere breach of contract" *Caring Professionals, Inc. v. Catholic Health Care System d/b/a Archcare*, No. 656248/2016, 2017 WL 5725516, at *20-21 (Sup. Ct. N.Y. Co. Nov. 22, 2017) *citing Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268, 269 (1st Dep't 2003) and the conversion claim here relies upon no facts other than those underlying the breach of contract claim, *i.e.*, the Post-Petition Account Charges were not in accordance with the account agreements.  Similarly, an unjust enrichment cause of action is 'precluded by the fact that a simple breach of contract claim may not be considered a tort unless a legal duty independent of the contract-*i.e.*, one arising out of circumstances extraneous to, and not constituting elements of, the contract itself-has been violated.' *Brown v. Brown*, 12 A.D.3d 176, 176 (1st Dep't 2004). Here, no such "circumstances extraneous to, and not constituting elements of, the contract itself-have been violated."

However, even assuming arguedo that claims for conversion or unjust enrichment can be asserted, the Trustee cannot recover the Post-Petition Account Charges under such theories.  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Caring Professionals*, 2017 WL 5725376, at 20-21, *citing Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006).  "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" *Id*.  Where, as here, the

conversion claim pertains to money, "the funds must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner" *Id., citing Matter of Clark*, 146 A.D.3d 495, 496 (1st Dep't 2017).

Here, the Trustee alleges that Wells Fargo converted CRS's property by reimbursing itself for the Post-Petition Account Charges. This contention does not establish that CRS had an immediate possessory interest in the funds that were used to pay the Post-Petition Account Charges or that they were segregated in a specifically identical manner for CRS's benefit. Therefore no conversion can be established.

Moreover, unjust enrichment also cannot be established. Under New York law, unjust enrichment, a plaintiff must allege: (i) a direct relationship with the defendant; (ii) that the defendant was enriched at the plaintiff's expense; and (iii) that it is against equity and good conscience to permit the other party to retain the benefits. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012). Here, Wells Fargo was not unjustly enriched because CRS and TSE continued to require the use of Wells Fargo's treasury management services to continue administering payroll for CRS and its customers and these charges were part of the cost of business to continue such arrangement.

### E.  Imposition of Punitive Damages Is Inappropriate

Finally, no basis exists to impose punitive damages against Wells Fargo for these charges, which were all assessed and paid to Wells Fargo in accordance with the full knowledge of the CRS CRO and in accordance with the APA Facility, account agreements and the two TSE Stipulations. Under New York law the purpose of awarding punitive damages is not to make the victim whole but to punish the defendant and to deter egregious conduct. *U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 160–61 (2d Cir.

1996) *citing Rocanova v. Equitable Life Assurance Society of the U.S.*, 83 N.Y.2d 603, 612

N.Y.S.2d 339, 342, 634 N.E.2d 940, 943 (1994) (vindicate public rights, not private wrongs).

Generally, punitive damages are not available for a breach of contract unless the breach of

contract also involves a fraud evincing a "high degree of moral turpitude" and demonstrating

"such wanton dishonesty as to imply a criminal indifference to civil obligations," punitive

damages are recoverable if the conduct was "aimed at the public generally" *Id. citing Walker v.*

*Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). Here, the Trustee cannot

demonstrate any such conduct on Wells Fargo's part. To the contrary, Wells Fargo was part of

the solution and not the source of any of the Debtors' problems.

## IV. THE WFFL BUYOUT PAYMENT IS NEITHER A PREFERENCE NOR A FRAUDULENT CONVEYANCE

The Trustee seeks to recover payment of $240,220.26 made by CRS to pay off 17 copier

leases. The Trustee seeks to recover the payment as an alleged preferential payment even though

this payment was fully secured because Wells Fargo's security interest extended to financial

accommodations extended by its affiliates, including WFFL, a subsidiary of Wells Fargo. In the

alternative, the Trustee seeks recovery of the payment as a constructive fraudulent conveyance to

the extent CRS was not counterparty to the copier lease. These payments cannot be recovered

fraudulent conveyances since CRS received value for the payment, the copiers, which were sold

as part of the sale of CRS's businesses.

Section 547(b) permits the Trustee to avoid any transfer of an interest of the debtor in

property: (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt

owed by the debtor before such transfer was made; (3) made while the debtor was insolvent;

(4) made on or within 90 days before the date of the filing of the petition (with respect to

creditors who are not "insiders" of the debtor); and (5) that enables such creditor to receive more

than it would receive in a Chapter 7 distribution had the transfer not been made. 11 U.S.C. § 547(b). The Trustee bears the burden of proving each of these elements. *See* 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996); *Goldberg v. Such (In re Keplinger)*, 284 B.R. 344, 346 (N.D.N.Y. 2002).

Even where the trustee demonstrates that the debtor was insolvent at the time of the transfers and that the other four requirements under 11 U.S.C. § 547(b) have been met, the defendant will still prevail if the defendant can establish that any of requirements under 11 U.S.C. § 547(c) have been met. Section 547(c) sets forth nine exceptions to Section 547(b). In pertinent part, Section 547(c) provides that "(t)he trustee may not avoid under this section a transfer …(2) to the extent that such transfer was … in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms … or (4) to or for the benefit of a creditors, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." 11 U.S.C. § 547(c).

The Trustee cannot establish that the WFFL Buyout Payment is a preference because Wells Fargo is a secured creditor that is entitled to receive the full value of its collateral, so by definition a payment of an obligation to a secured creditor cannot result in that creditor receiving more than the creditor would have gotten in a chapter 7 liquidation, which is a necessary element of a preference claim. Here, the WFFL Lease Buyout Payment was fully secured by the bank product agreement between Wells Fargo and, among others, Staffing, Diamond and CRS which extended Wells Fargo's security interest to related bank products involving its affiliates, including copiers leased by WFFL. Since there were excess collateral proceeds greater than the

APA loan to CRS, WFFL was entitled to those proceeds before other classes of creditors. Given that Wells Fargo was secured at the time of the WFFL Lease Buyout Payment, the payment cannot constitute a preference.

Moreover, Wells Fargo continued to finance CRS's operations following the WFFL Lease Buyout Payment thereby providing new value to CRS. Finally, the WFFL Lease Buyout Payment was also in accordance with the agreement between the parties and therefore made in the ordinary course of business of both CRS and Wells Fargo. In this regard, Courts have widely held that compliance with contractual terms is indicative of the ordinary nature of a transfer. *See, e.g., Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, 798 F.3d 983, 991 (10th Cir. 2015) ("[T]he court may refer solely to the written terms of the transaction to define the ordinary course of business between the parties."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003) ("In the absence of modifying behavior, we see no reason why we should not look to the terms of the parties' agreement in order to determine their ordinary course of business."); *KH Funding Co. v. Escobar (In re KH Funding Co.)*, 541 B.R. 308, 315 (Bankr. D. Md. 2015) ("[I]n the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract."). The WFFL Buyout Payment was expressly authorized by the terms of the copier leases.

Finally, the lease payments approximate a value slightly less than the depreciation in the leased copy machines. Accordingly, CRS received more than reasonable equivalent value when they purchased the machines from Wells Fargo and the WFFL Buyout Payment is not a fraudulent conveyance.

## V. WELLS FARGO WAS CONTRACTUALLY PERMITTED TO BE REIMBURSED FOR THE LEGAL FEES

The Trustee seeks to recover a portion of the loan advances to the CRS Debtors' loan facility on account of Wells Fargo's legal fees for which Wells Fargo was contractually entitled to be reimbursed for under the APA and the TSE Stipulation. The Trustee alleges that Wells Fargo was not entitled to indemnification or reimbursement for a material portion of the Legal Fees on grounds that (a) CRS' agreements with Wells Fargo did not permit Wells Fargo to recover legal expenses relating to matters involving the Cassera-affiliated entities or WFFL, or (b) legal expenses related to claims for which the Trustee prevails in this litigation. Contrary to the Trustee's contentions, the fees were absolutely necessary, eminently reasonable and contractually agreed upon.

Each of the Account Purchase Agreements provides for reimbursement of the Legal Fees. *See* Account Purchase Agreement at § § 11.07 and 11.19. Moreover, reimbursement of Wells Fargo's legal fees is also confirmed both by the TSE Stipulation and the Second TSE Stipulation each of which provides for CRS to reimburse Wells Fargo for its legal expenses. TSE Stipulation, ¶ 20. Second TSE Stipulation at 3.

Indeed, if it were not for the $100 million tax fraud at TSE and the subsequent TSE and CRS bankruptcies, Wells Fargo would not have been required to incur legal fees and expenses to protect its interests all the while funding an orderly liquidation of both TSE and CRS. Further, reimbursement of legal fees was in accordance with the APA Facility, account agreements, and also contemplated by the TSE Stipulation and the Second TSE Stipulation.

Dated: November 9, 2018

OTTERBOURG P.C.

By:    /s/ Richard G. Haddad
       Richard G. Haddad
       John Bougiamas
230 Park Avenue
New York, New York 10169
Tel.: (212) 661-9100
Email: rhaddad@otterbourg.com

*Attorneys for Defendants Wells Fargo Bank,*
*N.A. and Wells Fargo Leasing, Inc.*